**WILLIAM F. THOMAS v. WESTINGHOUSE ELECTRIC & MFG. COMPANY, a Corporation, and TRAVELERS INSURANCE COMPANY, a Corporation, and FLORIDA INDUSTRIAL COMMISSION.**

36 So. (2nd) 377 June Term, 1948
July 13, 1948 En Banc
Rehearing denied July 29, 1948

*Parks, Sanders & McEwen* and *Donald Walker,* for appellant.

*Heskin A. Whittaker,* for appellee.

BARNS, J.: '

On the 2nd day of August, 1943, the claimant was employed by Westinghouse Electric & Manufacturing Company and on said date was injured in a collision between an automobile in which he was a passenger and a United States Army truck. As a result of said accident claimant suffered a compound fracture of the right humerus, fractures of the eighth, ninth and tenth ribs on the left side, multiple skull fractures, concussion and cerebral hemorrhage, and other internal injuries. The carrier, Travelers Insurance Company, took upon itself payment of compensation and medical expenses, there being no question as to the accident's having been in the course of the claimant's employment.

The carrier voluntarily paid claimant for the period from the accident to October 31, 1943. The last draft, dated May 1, 1944, in the amount of $24.67, was apparently a delayed payment for a period ending October 31, 1943. The last payment of any kind made by the carrier in behalf of claimant was a medical bill in the sum of about $141.00, paid June 30, 1944.

The claimant returned to work in November, 1943, but thereafter found it necessary to stop work. No claim for compensation had at this time been *filed* with the Florida Industrial Commission and no claim for such compensation was so *filed* until September 18, 1946.

After being relieved by an encephalogram operation in 1946, claimant, on September 18, 1946, by letter to the Florida Industrial Commission, Tallahassee, Florida, filed claim for compensation and, pursuant to this claim, hearings were conducted. The carrier contested payment of the claim because of Section 440.19, Florida Statutes, 1941, which requires that

claims be filed within one year from the date of the accident or within one year of the last date of payment of compensation. Claimant maintained that it was not necessary for him to have *filed* his claim within that period because of subsection 3 of Section 440.19, Florida Statutes, 1941, which subsection provides that:

"If a person who is entitled to compensation under this chapter is mentally incompetent, . . . the provisions of subsection (1) shall not be applicable so long as such person has no guardian or other authorized representative. . . . "

Before the accident claimant had averaged an income for several years of approximately $300.00 per month, plus expenses, in the X-ray Division of Westinghouse, owned a home in Orlando, worked regularly, and lived in a normal manner with his wife and children.

Since claimant's injuries from said accident, he has done many queer things which indicate his mental incompetence. For example, on one occasion he was arrested and put under a $200.00 bond for being drunk and driving recklessly, when he had not been drinking. This was soon after the accident, on November 2, 1943. He would leave Orlando with a definite town as his destination and end up somewhere else without knowing why he was there. His employer found that he could not "keep his ducks in a row." He purchased materials to improve his home that were not suitable and were not used.

After the accident and shortly after being released from the hospital he tore down the chimney on his home and tore a big hole in the wall, took down one partition and tore out the wall on one side, went out and bought lumber and left it on the ground, leaving his home in a spoiled condition. He quarreled with his wife and children without due cause, so that they had to walk around on tiptoes.

Upon returning to work after the accident he became weak and lost about forty-five pounds in six weeks. He had begun to do queer and unusual things. At this point the carrier made an appointment for claimant with a brain specialist, Dr. J. G. Lyerly, of Jacksonville, Florida, who advised claimant to get off of the road and rest.

In April, 1944, he went to Jacksonville from his home in Orlando and ended up in New Orleans, without reason or explanation. He returned in an old 1932 or '33 dilapidated car, having left his good car in Panama City. "He wasn't right"; he dug his orange trees out of his yard by the roots and had them destroyed without reason; he sold his property, all of it, except that he allowed his wife to keep her sewing machine, toaster, waffle iron and electric iron; be bought a baby grand piano for $1200.00 while his finances were at such a low ebb that he could not pay for it, and the Company had to take it back; he bought his wife expensive linens and silver without regard to cost; he abused his credit.

In December, 1944, he suddenly took his family to visit his wife's mother, in Wichita, Kansas. During this visit his actions were such that on Christmas day her mother ordered him out of the house, saying that he was crazy and that she was not going to have him around. Her mother had always liked him and their previous visits with her had always been pleasant, but on this occasion he found fault with the room they occupied, accused her mother of picking on the children and insisted that he wanted to occupy an apartment belonging to her mother and wanted her to turn the tenants out of it and turn it over to them.

When they left her mother's home they went to a tourist camp and stayed about ten days. He then announced to his wife that he was going to Hawaii. She tried to talk him out of this but he told her that he thought it would be best for him to be away from the family; that he was in the way, and of no use to them, since he couldn't make a living for them, and that he was going to get out. So he left for Hawaii, early in 1945, but was not able to do satisfactory work there. She did not hear anything from him for a while. He sent her some money, three checks, while he was there, and she finally received a cable from him saying that he was coming home. When he returned home he was not able to work at all and was confined to his bed.

At this point, on April 27, 1945, claimant wrote the carrier for any benefits he might be entitled to receive. This letter

was answered by the carrier (Exhibit 4, T. 117) and further answered (Exhibit 8, T. 122).

In June of 1945 they returned to Florida and went to Inverness and took over a hunting and fishing lodge there. While there his mental condition grew worse; he would have periods of forgetfulness and did not seem to be able to think through on anything. He would say he was going to do one thing and would start it but would not stick to it and would start something else. At times he did not seem to know where he was and did not recognize her and the children. He was very nervous and would go into a rage over nothing. On one occasion a neighbor was going to take him to a meeting and the neighbor's child got sick and was threatened with pneumonia and the neighbor came over to explain why he could not take him to the meeting and his wife offered to go over and help with the child. After the neighbor left he accused her of doing everything she could to keep him from going to the meeting.

Although they had had to allow their insurance to lapse, as they were not able to pay the premiums, he told her that the only way he could see to provide for his family was for him to commit suicide in such a way that it would appear to be an accident, so that she could collect this insurance.

Mrs. Adams, a welfare worker, interviewed claimant about December 4, 1945, and observed that he had little coordination or motivation and was at a loss to know why he was in the city, and it was necessary to call someone to help get him back to his room. He was "in a fog"; he walked with a cane; he was not able to carry on a very coherent interview; he was emotionally upset; he appeared unusually irritable; he appeared depressed mentally, extremely depressed; his judgment was not good; he wanted to do things on too large a scale, so that it was not reasonable.

About December 4, 1945, claimant contacted Mr. Miller, of the Vocational Rehabilitation Service of the State Department of Education and thereafter worked out a program merely to keep claimant occupied so they could get him to doctors and have him examined. He was classified as a "mental incompetent"; he was not normal.

After examination and the encephalogram operation, Dr. Lyerly's conclusion was that *"he was suffering from a neurosis, a post-traumatic type of neurosis."* This was believed to be on a functional basis, and not due to organic pathology, although there was a question of some degenerative brain pathology.

Dr. Lyerly, whose specialty is neurological surgery, in reply to a hypothetical question regarding claimant's mental condition, answered:

"Judging from that question, *and the symptoms that the patient has at the present time,* it would indicate that the patient may be mentally unsound. All this must have happened after I saw him in February, 1946, which was the last time I examined him."

Dr. Lyerly further answered, after being informed that claimant's queer behavior started after he was dismissed from the hospital following the accident:

"A. You put things in that question that certainly sound like the patient might be mentally incompetent, but, as I stated, I don't like to give an opinion without more information, from direct personal examination. It was my personal opinion, though, from my own examination, that the patient was mentally competent.

"Q. Doctor, were these facts disclosed to you at the time you passed that opinion that he was mentally competent?

"A. I did not have these facts before me. They were not presented to me when I examined him. Therefore, I stated that I thought this condition existed since my last examination; and, if so, it would be a rather long time after the accident for the injury to be responsible for it."

Dr. Sullivan G. Bedell, a specialist in neurologic psychiatry, was called as a witness for claimant. Dr. Bedell testified in substance as follows:

"My diagnosis is post-traumatic neurosis; and my idea of the prognosis has undergone some change during the time that I have been seeing the patient. When I first saw the patient, at the request of the Vocational Rehabilitation, it was

my impression that we might, somehow, rehabilitate this man to the point that he would be able to follow some simple occupation; something less difficult than that in which he had been engaged previously.

"I understand that he is, at times, able to do odd jobs, but I think that is about as much as we can hope for. He seems to have gotten worse instead of better during the time that I have seen him.

"I have not seen the patient since December, and so I would hesitate to make a positive statement of his disability at the present date; but, judging from my earlier visits with him and from correspondence since my last visit with him, I would judge that he is totally and permanently disabled.

"I refer to what we term a post-traumatic neurosis; that is, as the aftermath of a serious head injury. He has a severe nervous state that renders him unemployable.

"It is my opinion that this illness is directly the result of the head injury that occurred in the accident described in the history. (The accident of August 2, 1943).

"I would consider that that was a part of the whole picture of post-traumatic neurosis, of which the head injury would be the cause."

"Q. If these facts be true, Doctor, would you say this patient is competent to manage his estate and affairs?

"A. No, I would not.

"Q. Doctor, would you say that he has ever been competent to manage his estate and affairs since said accident, based on this hypothetical question?

"A. No, I would say not.

"Q. Without this hypothetical question, and merely from your observation and examination and treatment of the patient, would you be able to state whether or not he is or was mentally incompetent—mentally competent or incompetent, in your opinion?

"A. I would say that he is mentally incompetent. I would like to add to that I have not seen him personally since December, but, judging from my last interview with him, I would make that statement.

694

"Q. Doctor, it appears from the patient or employee, Mr. Thomas's own testimony that he talks with apparent logic and intelligence. Can you explain, from your medical knowledge and experience whether or not a man can talk logically and intelligently and still be mentally incompetent?

"A. The sort of difficulty that Mr. Thomas has had does not have a great deal to do with the question of intelligence, but, rather, with the emotions. Mr. Thomas, apparently, has always been a man of more than average intelligence. He has an unusually good vocabulary, and ordinarily expresses himself in a manner which is above average. A person can still be intelligent and not able properly to put their intelligence to use because of emotional disturbance, and because of poor judgment.

"And I might just say, aside, that at any State hospital many of the patients who have been legally adjudged insane, can carry on a very intelligent conversation, with an excellent vocabulary.

"My idea of Mr. Thomas's incompetence is not that he has lost his intelligence, but that he has lost his ability to use his intelligence properly.

"I would like to clarify my statement a little bit, to say that, in expressing my opinion, I don't want to give the impression that I consider Mr. Thomas insane. I do not consider him insane, but I consider him incompetent to handle his affairs with proper judgment."

Dr. Lyerly, being a neuro-surgeon, would not be interested from the same angle as Dr. Bedell, who is both a neurologist and a psychiatrist. One has to bear in mind that this particular man is one of the "intelligent" mental incompetents, as explained by Dr. Bedell.

The testimony of every witness is consistent as to mental incompetence of claimant and that his mental incompetence originated with the accident. Dr. Bedell was the only psychiatric neurologist who testified, and the testimony of Dr. Lyerly, a specialist in neurological surgery (the other witness for respondent) did not conflict with the conclusion of Dr. Bedell.

Dr. Bedell, in 1946, had the advantage of a history of the patient from the time the accident occurred. He had the advantage of "hind sight" and he states that the claimant is *permanently disabled and that his disability was occasioned by the accident.*

After the brain operation, claimant's mental condition improved, but his physical condition, lack of energy and physical exhaustion, grew worse.

It is to be noted that within six months after the encephalogram was performed on the claimant, in 1946, he filed claim with the Florida Industrial Commission. It should be noted that such relief is expected to be of short duration.

The appellant's witnesses were the claimant and his wife, Mrs. Adams, a welfare worker, and Mr. Miller, a welfare worker, and Dr. Bedell.

The appellees' only witness was Doctor Lyerly.

Was the claimant so unsound in mind that he could not manage his ordinary affairs of life? If there be such a degree of unsoundness of mind as to incapacitate him for managing his ordinary business affairs, as he had been accustomed to do, then the claimant, under the liberal interpretation, would be "mentally incompetent."

We find that he was excused from *filing* a claim on account of his being mentally incompetent.

Allegations of the claimant as to his mental incompetence are overwhelmingly substantiated by a preponderance of evidence. The evidence introduced by claimant has not been contradicted. The finding of the Deputy Commissioner was erroneous and clearly against the preponderance of evidence.

It is our conclusion that the assignments of error relating to the mental incompetence of claimant are well founded and that the findings of the Commissioner and the Circuit Court against the claimant in this respect are erroneous, and the judgment appealed should be reversed.

Reversed.

TERRELL, CHAPMAN and HOBSON, JJ., concur.

THOMAS, C. J., ADAMS and SEBRING, JJ., dissent.