364 So.2d 1097 (1978)
SHIPPERS EXPRESS and Liberty Mutual Insurance Company
v.
Ernest CHAPMAN.
No. 50533.
Supreme Court of Mississippi.
November 1, 1978.
Rehearing Denied December 13, 1978.
Daniel, Coker, Horton, Bell & Dukes, B. Stevens Hazard, Jackson, for appellants.
Charles O. Jones, Doug Wade, Jackson, for appellee.
Before ROBERTSON, SUGG and COFER, JJ.
COFER, Justice, for the Court:
This case is here on appeal from a decision of the Circuit Court of the First Judicial District of Hinds County. The Workmen's Compensation Commission had held that the two-year statute of limitations afforded under Mississippi Code Annotated, section 71-3-35 (1972), within which after date of injury, claimants may apply for benefits, had run on the claim of appellee, Ernest Chapman, for such compensation. The circuit court reversed the commission's order.
We reverse the circuit court's decision and reinstate the order of the commission.
Appellee had been employed by Shippers Express since 1969. His employment duties were the repair of all kinds of tires used on the trucks of his employer and refill the trucks with gasoline, if he had spare time from his tire repair job.
On December 31, 1972, he was at the tasks of his employment and was rolling two tires. One of the tires fell, and as he tried to straighten it up, he lost his footing and fell, the other tire falling across his side and arm. He blanked out for a moment, then removed the tire from over him and arose. He felt numbing pain all day, the *1099 immediate feeling being like pins sticking in his upper left chest. He also received an abrasion or cut on his chest and left arm. When he arose from his fallen position, he went, twenty-five or thirty minutes after the accident, and told his boss that he had gotten hurt and that he was going home, and checked out at eleven a.m. and went home with pain in his left arm, left chest and shoulder. Later, without detailing here the intervening activity on his part, he was taken to University Hospital, Jackson, Mississippi, since which, to the date of his testimony, he had been returning to the hospital for treatment.
For purposes of this decision, it may be assumed that his injury and physical condition thereafter were related to, and caused by, the accident hereinabove noticed.
No payment of compensation has been made, and no application for benefits was filed by him with the commission until long after the expiration of the two years provided by Section 71-3-35.
On June 6, 1975, he filed a motion to controvert with the commission. Answer was accepted by the commission on June 16, 1975, wherein the employer and its carrier moved for dismissal of the claim asserting that it was barred by the statute of limitation and alleging other defenses. Answering the motion to dismiss, appellee said that he "was never advised by any physician that his injury was related to his employment with Shippers Express and claimant does not have the mental capacity to appreciate the nature and extent of his disability and the fact that his disability was proximately caused by the injury, and as a reasonable man could not know that he had sustained a compensable injury and disability." That on or about May 27, 1975, it was discovered by an examination of claimant's hospital records at the University Medical Center by claimant's attorneys that claimant's injury was job related and probably caused his disability.
Following hearing on May 18, 1976, on the sole issue of his mental competency, the Administrative Judge on June 18, 1976, entered an order reviewing the testimony adduced before him and made the following findings of fact:
Having heard and considered all of the evidence presented in this cause, both oral and documentary, which said evidence is considered to be substantial and having observed the demeanor of the claimant and the witnesses in this matter and having studied the very excellent briefs supplied by the attorneys, I make the following findings of fact, to-wit:
1. That the evidence submitted is insufficient to establish that the claimant was mentally incompetent to such an extent as would toll the Statute of Limitations as provided by Section 71-3-35 of the Mississippi Code of 1972, annotated, subsection (b)[2];
2. That the accident or injury occurred on December 31, 1972, and the Motion to Controvert was filed with the Commission on June 6, 1975; and
3. That the Statute of Limitations has run on any claim the claimant might have as a result of his accident and/or injury of December 31, 1972.
and denied and dismissed the claim.
The full commission, on review of the proceedings affirmed the Administrative Judge's order, with the chairman dissenting and rendering separate opinion.
Mississippi Code Annotated, section 71-3-51 (1972), says that on court review of the commission's orders:
If no prejudicial error be found, the matter shall be affirmed and remanded to the commission for enforcement. If prejudicial error be found, the same shall be reversed and the circuit court shall enter such judgment or award as the commission should have entered.
The Commission is the trier of facts and judge of the credibility of witnesses and a finding by it, supported by substantial evidence, is not to be disturbed on appeal. Roberts v. Junior Food Mart, 308 So.2d 232, (Miss. 1975), and authorities cited therein.
The substantial evidence necessary to support a finding of the commission may *1100 not be found from a small part of all of the evidence, and all of the evidence is necessary to be considered because the act is to be administered justly and reasonably. Tiller v. Southern U.S.F., Inc., 246 So.2d 530 (Miss. 1971).
A physician's testimony, though taken in isolation, might amount to substantial evidence supporting a finding by the commission, when considered with the entire evidence may lose much of its character and not rise to the position of substantial evidence. Harpole Brothers Constr. Co. v. Parker, 253 So.2d 820 (Miss. 1971).
Mental competency vel non determines running or tolling of the statute.
Appellants cite and quote from Thomas v. Westinghouse Electric and Mfg. Co., 160 Fla. 687, 36 So.2d 377 (1948); Edge v. Dunean Mills, 202 S.C. 189, 24 S.E.2d 268 (1943); Royal Indemnity Co. v. Agnew, 66 Ga. App. 377, 18 S.E.2d 57 (1941), and cite without quotation, Petteway v. Continental Casualty Co., 112 Ga. App. 496, 145 S.E.2d 635 (1965), and Kell v. Bridges, 77 Ga. App. 424, 48 S.E.2d 780 (1948), and conclude that "the recognized test for mental competency is whether or not a person is able to manage the ordinary affairs of life." (Emphasis added).
Appellee adopts in his brief, the test in the Agnew case, supra.
In other words, the test as to whether the claimant is so "mentally incompetent" as to toll the running of the statute of limitations, is this: is his mind so unsound, or is he so weak in mind, or so imbecile, no matter from what cause, that he cannot manage the ordinary affairs of life? (Emphasis added). (66 Ga. App. 380, 18 S.E.2d 59).
Thus, the parties are together insofar as the test of mentally competent or not is concerned.
Appellee and his psychological evaluator, Roy Otto Darby, III, testified and rested. Appellants used no witnesses.
The witness Darby, permitted by the Administrative Judge to testify as an expert in his field of psychological evaluation, saw appellee one time, on September 30, 1975, at the Jackson Mental Health Center, where the witness was employed. Appellee was sent by his attorney for psychological evaluation, and was assigned to the witness therefor. The witness interviewed him and conducted tests on him to "determine the present level of the claimant's intellectual and psychological functioning." He testified that appellee was very cooperative in all aspects of the proceedings, answered questions the best he could, was well oriented as to his person, who he was, the place of the examination, and the general nature of the situation in which he was involved at that moment, and was aware that he was being evaluated by the witness. He was a little confused as to the exact date, had to be reminded frequently to return to the question asked him or to the test on which he was. Appellee identified his own problems as being centered around being nervous. He was considerably concerned for his physical health and well-being. On historical data of himself and as to what was going on pertaining to him at the time, his thoughts tended to be very simple. He testified that in the interview "there was no evidence of any bizarre kind of thinking. His insight into what has happened was subjectively judged to be normal and his judgment also was found to be below average."
He administered the Wechsler Adult Intelligence Scale, a portion of the Wechsler Memory Scale, and the Rorschach Ink Blot and Bender-Gestalt. The adult intelligence test, he said, is that most frequently used method of measuring overall intelligence ability, and is generally accepted as the best way to measure a person's intellect. On the test, he scored an overall mark of 54 as compared to 100, the statistical average over a large population of people. In the memory test, his immediate recall was 3.5 on a scale of 7 to be expected; after 90 minutes, he could recall only two memories, from which the witness concluded he had a severe memory impairment. On The Bender-Gestalt, a widely used test, the appellee showed a severe perceptual motor deficit, a *1101 very low level of neuro-psychological functioning. On the Ink Blot test, the witness' conclusion was that appellee's performance suggested a person with rather confused thinking.
Among the conclusions he found he evaluated appellee as being "on the borderline to retarded range."
In a confidential report dated October 28, 1975, made Exhibit "A" to his testimony, wherein he said the examination was on September 30, 1975, he said "The results of these multiple deficits severely restrict Mr. Chapman's ability to cope with any but the least complex and least demanding situations."
On cross examination, he said his records showed appellee has a first grade education, no evidence of psychosis was found, he saw appellee only on the one occasion, September 30, 1975, and the total session with him took approximately two and a half or three hours.
He did not know how appellee was functioning on the date of the injury, and was not willing to say the findings of his September 30, 1975, session would be consistent with whatever findings he would have made had he had a session with him on the date of the accident. He had serious reservations as to appellee's ability to hold a job owing to his memory impairment and his overall intellectual functioning, and thought he would have to have high supervision and no responsibilities. He believed appellee needed assistance to carry out day to day activities. Under Rule 8, of the Rules and Regulations of the Commission, the witness was permitted to testify based on the session and on his experience as an evaluator, that his clinical opinion was that there has been some degradation of function but he believed that appellee has always been just a borderline retarded range. (Neither party asked for subsequent action by the Administrative Judge on this opinion.)
Appellee testified to the date of his birth, his age, for whom he was working on December 31, 1972, that on that date he got hurt, his duties, details of the accident, size of the tires he was rolling, which one fell on him, its weight, how he got out from under it, his approximate weight at the time, the condition of the dock on which he was working, approximate time of the occurrence, on which day of the week it happened, how he felt after the accident, what he did when he got back on his feet, that he told his foreman, Ollie Chalk, that he got hurt in about 25 to 30 minutes he reckoned, that he punched out at eleven a.m., went from the scene of his work on a Shippers Express truck, where he got out of the truck, that he walked from there about a block to his home, sat on his door steps before he entered the house, told of the pain in his left hand, left chest and shoulder, took a hot bath, went down the street, met a friend, drank an Alka-Seltzer, which did not help his feelings, sat down awhile, went back to his house, lay down the rest of the night, Saturday night, a friend stayed with him, who carried him to his sister's house, where he fell out, and she took him to the University Hospital to the doctor, he did not know when that happened, would say he went on Sunday night to the hospital, University Hospital, in Jackson, Mississippi, was paining him when he went in there, the same pain as on the day of the injury, they "doped" him up and he did not know anything until he awakened.
He further related that he started working for Shippers Express in 1969, before that time, he was working for B.F. Goodrich Company, fixing flats, "doing around," and washing trailers, this job lasting about a year and a half. Before his connection with Goodrich he hauled pulpwood, seven or eight years for one employer; he was born at Brookhaven, Mississippi, attended school one year, no other education, he could write his name, but could not read; he had been in the University Hospital two times before for a "little cut" over his eye, and he got his leg cut with a power saw, when he was about seventeen or eighteen years of age, and a doctor treated him for that injury; he was thirty-two years of age when he got his eye hurt; the eye injury was five or six years before the December 1972 accident; *1102 never had been to the doctor for his heart before.
From the University Hospital stay for the injury in question he has been going back and forth to his physician, who has been checking him to see the trouble he had. He had a pain or two immediately afterward, and that was why they kept bringing him back, and they gave him medicine and things, he is presently under a doctor's care, and last went to him in the month preceding his testimony, at the University Hospital; he gave an account of his usual duties at Shippers Express, had another helping him, but when the helping person was not there he did the work by himself, described again feelings immediately after the injury.
Again under Rule 8, he testified to what his doctor told him about his injury, to take care of himself and not be picking up anything heavy, or anything straining.
On cross examination, he told again some details of the accident, and of his duties, the hours of his work, condition of the weather, time he came to work that morning, had not been working after the injury.
He started working when he was above fourteen years old.
He detailed again certain of his testimony as to his activity in the hours and days after the injury. He was then living on Farish Street in Jackson, his sister lived at 105 Hannah Street, the next street over from Farish Street.
He told of having been married, that he was separated, about twelve years before, he last heard from his wife in California, he gave names of the two children born to the marriage, they live in California, grown now.
He went over certain of his job duties, the occurrence and said the company had seventy-five or eighty trucks, his doctor, Lee Hern, told him he had a heart attack. On July 1972 he got some diesel fuel in his eyes and reported it to his foreman, Chalk, and went to the doctor who gave him some eye medicine; at the hospital he had so many doctors he could not remember their names, about ten or twelve of them; they prescribed medicine for him, and he told the use of each of these, and told other instructions physicians had given him.
This exchange between him and the attorney:
Ernest, I take it you are able to take care of your money and pay your bills?
I just have enough to pay my bills.
And you know how to pay those bills, don't you?
Right.
We have gone to extensive length in relating the testimony of both appellee and Mr. Darby, the former in much the same order and sequence thereby reflecting his memory and thinking functioning.
Perhaps, alone and in spite of its remoteness to the injury, and the entire two years while the statute of limitations was in operation, Mr. Darby's testimony might be appraised as substantial evidence, on which to base a decision of mental incompetency on the part of appellee during the crucial period. The open detailed testimony of appellee which appears from the record to have been given with little hesitancy, faltering or difficulty in remembering, dilutes and drains away much of the character of that given by Mr. Darby. We conclude that instead of reliance on Mr. Darby's testimony, the Administrative Judge and the majority of the commission had very substantial evidence upon which to base their decisions against appellee's mental incompetency under the statute. Harpole Brothers Constr. Co. v. Parker, supra.
The decision of the commission was correct in our opinion, and we reverse the circuit court's decision and reinstate the order of the commission.
REVERSED AND ORDER OF THE COMMISSION REINSTATED.
SMITH, and ROBERTSON, P. JJ., and SUGG, WALKER and BROOM, JJ., concur.
PATTERSON, C.J., and LEE and BOWLING, JJ., dissent.
*1103 BOWLING, Justice, dissenting:
I dissent from the majority opinion. A study of the record in this case convinces me that a grave injustice would be done if this Court did not uphold the written, analytical opinion of J.T. Noblin, Chairman of the Mississippi Workmen's Compensation Commission, and the opinion of the Circuit Court finding that opinion to be correct.
There is no real dispute in the record. The only testimony was that of the claimant, Ernest Chapman, and Roy Otto Darby, III, a psychologist with the Jackson Mental Health Center. Mr. Darby had a master's degree and equivalent schooling for a pending PHD in Clinical Psychology. All he lacked was completing his internship. His testimony has to be accepted by this Court and is, in any manner, only offset by the cold words of the record relating the claimant's testimony. In my humble opinion, we, as an appellate court, cannot read into the appellant's testimony the evidence of a mentally competent person as was implied in the majority opinion.
The sole question before the Commission, the Circuit Court, and this Court was whether or not the two-year statute of limitations for bringing the claim was tolled by Mississippi Code Annotated section 71-3-35(2) (1972), which provides as follows:
If a person who is entitled to compensation under this chapter is mentally incompetent or a minor, the limitation for filing application for benefits shall not be applicable so long as such person has no guardian or other authorized representative, ... .
Appellant's testimony revealed that he has no education and cannot read or write. The only work he has done is such as hauling pulpwood, fixing flat tires and putting gasoline in vehicles. It is undisputed that he even needs supervision to do this type of work, and always has.
The appellant received his injury on December 31, 1972. His request for compensation was not made until June 6, 1975, five months and one week after the statute of limitations had expired. The record is completely clear that during this period of time he had no idea that he had a possible claim for workmen's compensation and could not appreciate it if he had such knowledge. It is clear from the record that someone finally got an attorney to check the medical and hospital records to ascertain the possible claim, something that obviously not even his doctor had advised him. It could be that this situation resulted from the fact that he was treated at the University Hospital where he was seen by many different doctors, interns and students.
Mr. Darby, an admitted expert, had the only testimony in the record on which appellee's condition can be based, and testified that Chapman related the events that had happened over the years "haphazardly." During the interview and the tests, Chapman's thought processes "as reflected in his speech, would tend to become conjunctional, which means he would begin on one subject and would trail off into a series of other subjects." The tests revealed that Chapman had an IQ of 54, with his performance IQ being 48. Several tests were administered, one of which was Chapman's performance on the "Bender Gestalt test." which revealed "severe perceptual motor deficits" and a "very low level of neuro-psychological functioning." One of the main tests given Chapman revealed that "he's a man whose mental approach shows deficiency in being able to cope in an ambiguous situation or a non-structured situation and to put it together as a meaningful whole."
The psychological evaluation summary was as follows:
The results of the total interview data and the test data portray an individual with significant neurological impairment as well as personality handicaps. His overall mental function is evaluated to be on the borderline to retarded range. There is evidence of significant neuropsychological deficit, particularly in the perceptual motion operations and memory areas. His personality development and organization is likewise poorly organized. His view of realty is poorly, although this is not a psychotic condition. He is only mentally able to deal with emotional demanding *1104 situations. His emotions are not well indicated to his personality and to me he shows a number of deficits in all area.
The specialist further testified that Chapman "was oriented as to the person, place and situation but not as to time." He further stated that he had reservations as to whether Chapman could adequately perform jobs such as a pulpwood hauler and changing tires. To do this, he would have to "be highly supervised with no responsibilities."
With the above undisputed evidence, the only way the hearing officer, the two members of the Commission and this Court could hold the appellee mentally competent was, as stated at the outset, from the cold words in the record, which, with deference, do not justify discarding the undisputed expert testimony in connection with the history of appellee both before and after his injury.
There are a number of "statutes of limitations" barring claims and various types of actions in a number of different activities and legal situations. An examination of them reveals that these statutes state that "a person of unsound mind" is not subject to the limitation period. The Legislature, in enacting the Workmen's Compensation law, recognized that one excuse for substituting that law for the old master-servant liability was a liberal interpretation of the act in favor of the injured working person. The Legislature saw fit not to follow the language of the other statutes of limitations but only required that the guideline for tolling the two-year statute in question was that the claimant "be mentally incompetent." It is beyond this writer's thinking that the evidence related above, even when considering the cold testimony of the claimant in the record, would justify a finding by any judicial or quasi-judicial body that the claimant had sufficient mental competency to permit the running of the two-year statute of limitations.
I realize the many opinions of this Court holding that the Commission is the trier of fact, even though the statute granting appeal from the Commission to the circuit court mandates that the "circuit court shall review all questions of law and of fact," without any statutory limitation. Even without this mandate, I do not think that the holding of the two members of the Commission should be of any greater import than the one member, the chairman, whose opinion is hereinbefore discussed. This is reasoned by the mandate in the Workmen's Compensation Law (Code § 71-3-85), that one member of the Commission shall have represented employers, one member shall have represented employees, with one member being impartial. I do not think that the circuit court or this Court should be put in a position of guessing which member represents which party and going along with the theory that what the majority finds as a fact is in reality the correct fact, or whether or not the factual finding is erroneous. As stated above, this is contrary to the statute which requires the circuit court to review questions of fact.
I would affirm the finding that the appellee was not mentally competent as required by the statute.
PATTERSON, C.J., and LEE, J., join in this dissent.