IN THE SUPREME COURT OF MISSISSIPPI

NO. 2010-CT-00380-SCT

*IN THE MATTER OF THE ESTATE OF LOUIS
ST. MARTIN, DECEASED: JAMES R. FORBES*

*v.*

*EDLEY HIXSON AND ST. MARTIN, MAHONEY &
ASSOCIATES, PROFESSIONAL LAW
CORPORATION*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 10/01/2009 |
| TRIAL JUDGE: | HON. GLENN BARLOW |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | STEPHEN J. MAGGIO |
| ATTORNEYS FOR APPELLEES: | KYLE S. MORAN |
| | JAMES G. WYLY, III |
| NATURE OF THE CASE: | CIVIL - LEGAL MALPRACTICE |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED.  THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS REINSTATED AND AFFIRMED - 05/22/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1. James Forbes settled his personal-injury action while he was represented by Louis St. Martin.  Forbes later sued St. Martin, challenging the validity of his contingency-fee arrangement with St. Martin and the associated attorneys' fees.  The Chancery Court of

1

Harrison County granted summary judgment to St. Martin; the Court of Appeals reversed the chancery court's decision and remanded the case for further proceedings. We reverse the Court of Appeals' judgment and find that summary judgment in favor of St. Martin was proper.

## FACTS AND PROCEDURAL HISTORY[1]

¶2. In early August 1998, Forbes was severely injured in a gas-station explosion in Biloxi, Mississippi. He was transported to Mobile, Alabama, for medical treatment, where he remained in a comatose state for several weeks. While Forbes was comatose, St. Martin, an attorney licensed in Louisiana, visited Forbes's wife, Lisa, in the hospital in Mobile at the request of Lisa's family members. Lisa entered into a contingency-fee contract for representation with St. Martin, under which St. Martin would receive one-third of any settlement or judgment obtained. St. Martin gave Lisa $700 for living expenses on the day she executed the contingency-fee contract.

¶3. Thereafter, St. Martin associated Jon Mark Weathers, a Mississippi attorney, to serve as local counsel. Weathers drafted and filed a personal-injury complaint on behalf of Forbes. St. Martin did not sign the complaint, but he was listed as "of counsel." In October 1998, approximately two months after Lisa signed the initial contract, St. Martin met with Forbes in the Mobile hospital. St. Martin and Forbes discussed the contingency-fee contract and St. Martin's representation, but Forbes did not execute a new contract. Over the course of his

---

[1]A detailed account of the facts and procedural history is found at ***Forbes v. Martin***, 2013 WL 791847 (Miss. Ct. App. March 5, 2013).

representation, St. Martin advanced the Forbeses approximately $100,000 for living and medical expenses, vacations, a car, and other personal expenses.

¶4.    In June 1999, the Forbeses traveled to St. Martin's Louisiana office to discuss a settlement offer, which they ultimately rejected. During that meeting, the Forbeses executed a second contingency-fee contract, under which St. Martin would receive one-third of any settlement or forty percent of any settlement or judgment obtained if the case went to trial. Forbes's case eventually was settled for more than $13 million. St. Martin never signed any pleadings and never entered an appearance in Forbes's case; however, St. Martin was listed as "of counsel" on the initial complaint and did attend depositions in Mississippi. St. Martin testified that he was listed on the initial complaint by mistake and his name was promptly removed, and that, although he attended, he did not participate in the depositions.

¶5.    Nearly a year-and-a-half after Forbes settled his personal-injury claim, Forbes sued St. Martin alleging breach of fiduciary duty, fraud, and conversion, and requesting rescission of the contract, imposition of a constructive trust, attorneys' fees, and actual and punitive damages.[2] He amended his complaint in 2007 to add an allegation of professional negligence. Forbes argued that the contracts were void and sought to recover the fees St. Martin received under the contracts. The parties filed competing motions for summary judgment. After a hearing, the chancery court granted summary judgment in favor of St. Martin. Forbes appealed, and we assigned the case to the Court of Appeals.

_____

[2]The complaint also named Weathers and Weathers's firm, but it was later dismissed.

3

¶6. The Court of Appeals found that the chancery court had erred in granting summary judgment on all claims, because there were disputed questions of fact, and it remanded the case for further proceedings. We granted certiorari.

**STANDARD OF REVIEW**

¶7. We review the grant or denial of a motion for summary judgment de novo, viewing the evidence "in the light most favorable to the party against whom the motion has been made."[3] Summary judgment is appropriate and "shall be rendered" if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[4] Importantly, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, will be entered against him."[5] Furthermore, "summary judgment 'is appropriate when the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the

---

[3] *Pratt v. Gulfport-Biloxi Reg'l Airport Auth.*, 97 So. 3d 68, 71 (Miss. 2012) (citations omitted).

[4] Miss. R. Civ. P. 56(c).

[5] Miss. R. Civ. P. 56(e).

4

burden of proof at trial."''"[6]

## DISCUSSION

¶8.     This is a legal malpractice case. "In order to recover for legal malpractice, a plaintiff must prove by a preponderance of the evidence the existence of a lawyer-client relationship, negligence on the part of the lawyer in handling his client's affairs entrusted to him, and some injury proximately caused by the lawyer's negligence."[7]  It is undisputed that an attorney-client relationship existed between St. Martin and Forbes; therefore we begin our analysis by addressing Forbes's negligence claims.

¶9.     "Negligence is a failure to do what the reasonable person would do under the same or similar circumstances."[8]  To state a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty, that the defendant breached its duty, and that the breach caused an injury to the plaintiff.[9]

> Generally, attorneys owe to their clients duties falling into three broad categories. First[,] he owes a duty of care consistent with the level of expertise he holds himself out as possessing. This duty of care imports not only skill or expertise, but diligence as well. Second[,] he owes his client a duty of loyalty and fidelity, which includes duties of confidentiality, candor and disclosure. Third, he owes any duties created by his contract with his client.[10]

---

[6]*Buckel v. Chaney*, 47 So. 3d 148, 153 (Miss. 2010) (citations omitted).

[7]*Baker Donelson Bearman & Caldwell, P.C. v. Muirhead*, 920 So. 2d 440, 449 (Miss. 2006).

[8]*Muirhead*, 920 So. 2d at 449.

[9]*Patterson v. T.L. Wallace Constr., Inc.*, 133 So. 3d 325, 330 (Miss. 2013).

[10]*Muirhead*, 920 So. 2d at 449.

Forbes accuses St. Martin of violating his duty of care and his duty of loyalty. The analysis is different for the two duties, therefore we will address them separately.

## I. Duty of Care

¶10. A lawyer's duty of care requires him "to exercise the knowledge, skill, and ability ordinarily possessed and exercised by the members of the legal profession similarly situated." To recover for a duty-of-care violation, a plaintiff must show that "but for their attorney's negligence, he would have been successful in the prosecution or defense of the underlying action."[11] This is commonly known as the "trial-within-a-trial test."[12]

¶11. It is undisputed that St. Martin helped Forbes obtain a favorable settlement of Forbes's personal-injury action. Forbes repeatedly testified that he was happy with the result of his case and that he thought St. Martin did an excellent job. In fact, in his appellate brief, Forbes asserts that:

> This is not a legal malpractice case in the usual sense. Mr. Forbes is not claiming his lawyers committed error which adversely affected the outcome of his case. St. Martin and his attorneys place great emphasis on the fact that he was asked over thirty times whether he was satisfied with his attorney's representation and the outcome of his legal matter and in each instance he said he was. However, that argument is misplaced. If asked a million times more, he would answer the same. Mr. Forbes'[s] satisfaction with the representation and the handling of the lawsuit is not at issue.

We find no evidence that St. Martin breached his duty of care.

## II. Duty of Loyalty

---

[11]*Wilbourn v. Stennett, Wilkinson & Ward*, 687 So. 2d 1205, 1215 (Miss. 1996).

[12]*Crist v. Loyacono*, 65 So. 3d 837, 842 (Miss. 2011).

6

¶12.    An attorney's duty of loyalty is also known as his fiduciary duty.[13]  "When a legal-malpractice claim is based on an allegation of breach of fiduciary duty, the plaintiff must establish (1) the existence of an attorney-client relationship; (2) the acts constituting a violation of the attorney's fiduciary duty; (3) that the breach proximately caused the injury; and (4) the fact and extent of the injury."[14]  However, unlike a duty-of-care violation, a plaintiff alleging a duty-of-loyalty violation does not have to prove "that, but for the breach, the plaintiff would have won the underlying case.  Rather, the proof of proximate cause in such cases is to be tailored to the injury the client claims and the remedy he elects."[15]  Here, the injury Forbes alleges is being bound by a one-third contingency-fee agreement with St. Martin, and the remedy he seeks is the return of the fee he paid to St. Martin.

¶13.    There are two disputed contracts, both of which contain a one-third contingency-fee provision.  The first contract was executed by St. Martin and Lisa Forbes in Mobile, Alabama, on August 11, 1998 (1998 contract).  The second contract was executed by St. Martin, Lisa Forbes, and James Forbes in New Orleans, Louisiana, on June 10, 1999 (1999 contract).  Forbes presents multiple challenges to the propriety of the contracts based on their provisions and St. Martin's behavior.

A.    Contract provisions

---

[13] *Wilbourn v. Stennett, Wilkinson & Ward*, 687 So. 2d 1205, 1215 (Miss. 1996).

[14] *Crist v. Loyacono*, 65 So. 3d 837, 842-43 (Miss. 2011).

[15] *Crist*, 65 So. 3d at 842 (internal quotes omitted).

7

¶14.    Forbes claims that both contracts contain two invalid provisions that void the contracts in their entirety.  The first provision reads:

> My (Our) attorney is to have the exclusive handling of this claim and I (we) will cooperate with him.  No compromise can or will be made without my (our) signature(s) and without the approval and signature of my (our) attorney . . . .

The second provision reads:

> My (Our) attorney may be fired only for negligent handling of my (our) claim or failure to pursue my (our) claim with ordinary legal diligence.  In all other cases, my (our) attorney is entitled to a full fee as outlined above for any settlement I (we) receive in the above matter, even though other counsel may be consulted or hired.  I (We) have signed this agreement only after reading and explanation by the abovementioned attorney.

¶15.    We agree that antisettlement and antitermination clauses in contingent-fee contracts have been held to be unenforceable.[16]  However, Mississippi caselaw is abundant that "if a court strikes a portion of an agreement as being void, the remainder of the contract is binding."[17,18]  Neither of these provisions was at issue in this case.  No evidence was

---

[16]*See **Zerkowsky v. Zerkowsky***, 131 So. 647, 648 (Miss. 1931);  ***Cochran v. Henry***, 65 So. 213, 216 (Miss. 1914).

[17]***Russell v. Performance Toyota, Inc.***, 826 So. 2d 719, 725 (Miss. 2002) (citing ***Smith v.Orkin Exterminating Co.***, 791 F. Supp. 1137, 1142 (S.D. Miss. 1990); ***Richards v. Allstate Ins. Co.***, 693 F. 2d 502, 505 (5th Cir. 1982); ***Lawler v. Government Employees Ins. Co.***, 569 So. 2d 1151, 1153 (Miss. 1990); ***Plaza Amusement Co. v. Rothenberg***, 131 So. 350, 357 (Miss. 1930); ***Adams v. Standard Oil Co.***, 53 So. 692 (Miss. 1910)).

[18]The Court of Appeals erroneously concluded that the invalid provisions void the parties' entire agreement.  *See **Zerkowsky v. Zerkowsky***, 131 So. 647, 648 (Miss. 1931) (holding that a client has the right to dismiss a case over his attorney's objection but not discussing the effect of an antitermination clause on an entire contract's validity); ***Cochran v. Henry***, 65 So. 213, 216 (Miss. 1914) (holding that a contract provision prohibiting a client

presented that these provisions caused any breach of duty or damages to Forbes. As such, we find that the contracts' two invalid provisions should be struck,[19] but that the remainder of the contracts, including the contingency-fee provision, is still binding.

## B.      St. Martin's Behavior

### 1.      Filing of Lawsuit

¶16.    It is undisputed that James Forbes was in a medically-induced coma when his wife, Lisa Forbes, executed the 1998 contract with St. Martin and when St. Martin associated local counsel to file a personal-injury action on Forbes's behalf. Forbes accuses St. Martin of taking undue advantage of him by assuming his representation without his consent at a time when he was incompetent to enter a contract. While it is true that "[a]ny transaction in which an attorney may have taken undue advantage of the client is voidable . . . an informed and competent client, acting voluntarily, may ratify any such contract."[20]

> Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him. Ratification may be established by affirmative acts or inaction.

***Barnes, Broom, Dallas & McLeod, PLLC v. Estate of Cappaert***, 991 So. 2d 1209, 1212

---

from settling her claim without her attorney's consent is void but suggesting such a provision is not fatal to the rest of the contract); ***Whittington v. H.T. Cottam Co.***, 130 So. 745, 749 (Miss. 1930) (Ethridge, J., dissenting).

[19]The first provision cited above contains the language upon which the dissent focuses, that St. Martin was "to have exclusive handling of this claim."

[20]***Tyson v. Moore***, 613 So. 2d 817, 823 (Miss. 1992).

(Miss. 2008) (citing *Autry v. State*, 698 So. 2d 84, 87 (Miss. 1997)). The test for competency is "whether a person could know or understand his legal rights sufficiently well to manage his personal affairs."[21]

¶17.     The evidence shows that, before Forbes executed the June 1999 contract with St. Martin, he had regained his mental and physical capabilities and was capable of handling his own affairs.   In fact, in his motion for partial summary judgment, Forbes admits that "sometime after January 1999 [he] regained his physical and mental capabilities."   The evidence also shows that St. Martin discussed his representation with Forbes in October 1998 while Forbes was still in the hospital in Mobile.   Forbes was unable to sign a contract at that time because his hands were bandaged.   Although the parties dispute the extent of St. Martin's explanation during the October 1998 visit, at his deposition, Forbes testified that he was aware that Lisa had hired St. Martin to represent them, that he approved of the hiring, and that he understood St. Martin would receive one-third of any recovery.   The following excerpts from Forbes's deposition are illustrative:

> Q.     And I assume you talked to your wife about the fact that she had signed a document to hire Mr. St. Martin; is that correct?
> A.     Yes.
> Q.     Okay.  And you certainly didn't object to that; in fact you agreed to it didn't you?
> . . .
> A.     Yeah.
> . . .

---

[21]*Rockwell v. Preferred Risk Mut. Ins. Co.*, 710 So. 2d 388, 391 (Miss. 1998) (quoting *Adkins v. Nabors Alaska Drilling, Inc.*, 609 P.2d 15, 23 (Alaska 1980)).

10

Q. And you didn't – you didn't register any objection that the fee was something other than what you had agreed to, that it was different than what you agreed to?

A. The standard 33 percent, you know, so.

Q. So that was satisfactory with you, because that's what you agreed to; is that correct?

A. Yes.

Q. And it was the standard 33 and a third percent, so you thought that was reasonable, didn't you?

A. Yeah.

. . .

Q. And did you realize, whenever you regained consciousness and you were – you know, were capable of understanding and appreciating what was – what had happened to you, that a lawsuit had been filed on your behalf and Lisa's behalf, pursuant to the contract that Lisa had entered into with Mr. St. Martin?

A. Like I say, I mean, I trusted what she did you know.

Q. And do you have any fault or find anything unreasonable about either the way that Mr. St. Martin or Mr. Weathers prosecuted your case or the fact that Lisa got them involved in the case early on?

A. No.

As such, we agree with the chancery court that Forbes ratified the August 11, 1998, contract through his subsequent dealings with St. Martin and by entering the June 1999 contract.

### 2.     Cash Advances

¶18.    Next, Forbes faults St. Martin for advancing him approximately one hundred thousand dollars in the year before the case settled.  Forbes claims the advances violated Rule 1.8(e) of the Mississippi Rules of Professional Conduct and two criminal statutes.

*Mississippi Rules of Professional Conduct*

¶19.    Rule 1.8(e) states, in pertinent part, that:

A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation . . . except that:

11

1.  A lawyer may advance court costs and expenses of litigation, including but not limited to reasonable medical expenses necessary to the preparation of the litigation for hearing or trial, the repayment of which may be contingent on the outcome of the matter; and

2. A lawyer representing a client may, in addition to the above, advance the following costs and expenses on behalf of the client, which shall be repaid upon successful conclusion of the matter.

> a. Reasonable and necessary medical expenses associated with treatment for the injury giving rise to the litigation or administrative proceeding for which the client seeks legal representation; and
> b. Reasonable and necessary living expenses incurred.
> . . .

Payments . . . shall be limited to $1,500 to any one party by any lawyer . . . unless . . . approved by the Standing Committee on Ethics of the Mississippi Bar.

St. Martin's cash advances of approximately $100,000 to the Forbeses for vacations, living expenses, and cars would no doubt violate Rule 1.8(e) if he was subject to our Rules of Professional Conduct.[22]  But, even so, we have clearly stated that a violation of our Rules of Professional Conduct:

[D]oes not give rise to a cause of action nor should it create any presumption that a duty has been breached.  The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies.  They are not designed to be a basis for civil liability.  Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing

---

[22]Notably, the cash advances St. Martin made are permissible under the Louisiana Rules of Professional Conduct.  *See* LSA-R.S. § 37:218; *see also* **The Mississippi Bar v. Attorney HH**, 671 So. 2d 1293, 1296 (Miss. 1995) (observing that the Louisiana Supreme Court "held that where an attorney advances funds to an indigent client for medical and living expenses, the advancement does not run afoul of the rules").

parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.

*Wilbourn v. Stennett, Wilkinson & Ward*, 687 So. 2d 1205, 1216 (Miss. 1996). Therefore, a violation of Rule 1.8(e), standing alone, is not a basis for voiding a contingency-fee agreement.

¶20. The Court of Appeals found that there is "clear and abundant Mississippi authority" that the improper advances would "void the contingency-fee contract." *Forbes*, 2013 WL 791847, at *8 (citing *Smith v. Simon*, 224 So. 2d 565, 566 (Miss. 1969) ("the courts have the duty and the power to declare void and unenforceable contracts made in violation of law or in contravention of the public policy of the state . . . .")). However, while acknowledging the Court's power to void illegal contracts, this Court further stated that "not every contract with some illegal aspect is void and unenforceable." *Smith*, 224 So. 2d at 566. The Court of Appeals cited no authority in support of its conclusion that the improper advancement of funds would void the parties' contracts.

*Criminal Statutes*

¶21. Forbes also claims that the cash advances constitute crimes pursuant to Sections 97-9-11 and 73-3-57 of the Mississippi Code. Section 97-9-11 states:

It shall be unlawful for any person, firm, . . . either before or after proceedings commenced: (a) to promise, give, or offer, or to conspire or agree to promise,

13

give, or offer, (b) to receive or accept, or to agree or conspire to receive or accept, (c) to solicit, request, or donate, any money, bank note, bank check, chose in action, personal services, or any other personal or real property, or any other thing of value, or any other assistance as an inducement to any person to commence or to prosecute further, or for the purpose of assisting such person to commence or prosecute further, any proceeding in any court or before any administrative board or other agency, regardless of jurisdiction; provided, however, this section shall not be construed to prohibit the constitutional right of regular employment of any attorney at law or solicitor in chancery, for either a fixed fee or upon a contingent basis, to represent such person, firm, partnership, corporation, group, organization, or association before any court or administrative agency.[23]

Section 73-3-57 states:

It shall be unlawful for an attorney at law licensed in this or any other state, either before or after action brought, to promise, or give or offer to promise or give, a valuable consideration to any person as an inducement to placing, or in consideration of having placed in his hands, or in the hands of any partnership of which he is a member, a demand of any kind, for the purpose of bringing suit or making claim against another, or to employ a person to search for and procure clients to be brought to such attorney.[24]

These statutes make it unlawful for any attorney to give cash or anything of value to another person to entice him or her to commence a lawsuit against another. James Forbes testified that St. Martin did not promise him cash to induce him to sign the 1999 contract or to continue the representation, and Forbes presents no evidence to the contrary. In fact, Forbes testified in his deposition that St. Martin did nothing to induce him or Lisa to sign either of the contracts. As such, there is no evidence that the cash advances constituted a crime under

---

[23]Miss. Code Ann. § 97-9-11 (Rev. 2006).

[24]Miss. Code Ann. § 73-3-57 (Rev. 2012).

14

these statutes.

### 3. June 1999 Contract

¶22.    Next, Forbes argues that, despite his signature, the 1999 contract was irreparably tainted by St. Martin's failure to disclose that the contract increased his fee (i.e., taking the case from *quantum meruit* to a one-third contingency fee) and by his misguidance regarding an hourly-rate arrangement versus a contingency-fee arrangement.

*Failure to Disclose*

¶23.    Forbes claims that the 1999 contract increased St. Martin's fee from a *quantum meruit* fee to a one-third contingency fee and that St. Martin failed to disclose this increase. Forbes's argument assumes that, prior to the 1999 contract, St. Martin was entitled only to a *quantum meruit* fee, because Forbes was not bound by the one-third contingency-fee provision in the 1998 contract. However, as discussed previously, the record clearly shows that Forbes ratified the first contract. And if Forbes was bound by the 1998 contract, the 1999 contract did not increase St. Martin's fee, as it was the same as in the 1998 contract.

*Misinformation on Hourly Rate versus Contingency Fee*

¶24.    Next, Forbes's complaint alleges that St. Martin misinformed him on the differences between an hourly-fee arrangement and a contingency-fee arrangement. However, a complete reading of the record makes it clear that, before executing the 1999 contract, St. Martin advised Forbes of the differences, and Forbes testified he could not afford to pay St.

15

Martin an hourly rate.[25] Forbes repeatedly testified that he thought a one-third contingency

fee was reasonable, that he did not think St. Martin had defrauded him, and that he thought

St. Martin had done an excellent job.  The following excerpts from Forbes's deposition are

illustrative:

> Q. . . . Did [Mr. St. Martin] induce you to do something against your will – to sign that contract against your will?
>
> A. No.
>
> . . .
>
> Q. Is there anything – is it your position that Mr. St. Martin failed to disclose to you any information, before asking you to sign [the 1999] contract, any information you needed before asking you to sign that contract?
>
> A. As far as I know, no.
>
> Q. And we've already been through the settlements, and you've already explained how that was calculated, and the fact that you agreed to that settlement and agreed to the amounts that were deducted for attorneys' fees, didn't you?
>
> A. Yeah.
>
> Q. And you agreed to the other deductions we've been over; is that correct?
>
> A. Yes.
>
> . . .
>
> Q. In fact, you don't know of anything in the actions that Mr. St. Martin, his firm, or the actions of Jon Mark Weathers and his firm, did that were contrary to your best interest in this lawsuit, do you, Mr. Forbes?
>
> . . .
>
> A. I'm not – I don't know.  I mean, as far as I know, all they said – you know, I thought everything was cool and everything with it and all.
>
> Q. Okay.  By that, you mean you – you thought they did everything in

---

[25]*See **Forbes**, 2013 WL 791847, at \*20.  Forbes testified as follows:

> Q. Could you, in fact, afford to pay [Mr. St. Martin] on an hourly basis to pursue this claim?  Did you have the – any funds to do that with?
>
> A. No.  No.

16

your best interest in representing you in this case, didn't you?

. . .

A.    I'll have to say, yeah, you know. Yeah. Yeah.

Q.    Okay.  And you can't sit here today and tell me, thinking back, anything they did that wasn't in your best interest in representing you for your injuries arising out of this fire, can you?

A.    Yeah.  I mean, I thought – I mean, I was happy the way things turned out, yeah.

¶25.    After reviewing the record, we find no questions of fact as to whether St. Martin failed to disclose information prior to the parties' June 1999 contract which would render the entire contract void.

**5.    Unauthorized Practice of Law in Mississippi**

¶26.    Finally, Forbes claims that St. Martin engaged in the unauthorized practice of law by "appearing" in his personal-injury case when he was not licensed in Mississippi and had not been admitted *pro hac vice*.  His allegation is based on St. Martin initially being listed as "of counsel" on Forbes's personal-injury complaint, attending depositions in Mississippi, and advising the Forbeses on Mississippi law.[26]  Forbes goes on to argue that St. Martin's unauthorized practice of law voided any alleged contract between the parties.  The Court of Appeals found that there was "a genuine issue of material fact in dispute as to whether St. Martin and the St. Martin firm were engaged in the unauthorized practice of law in the representation of the Forbeses" which precluded summary judgment in favor of St. Martin. In reaching this conclusion, the Court of Appeals relied on Section 73-3-55 of the Mississippi

---

[26]St. Martin testified that he did not participate in the depositions he attended.

17

Code, Rule 46 of the Mississippi Rules of Appellate Procedure, and this Court's opinion in *In re Williamson*, 838 So. 2d 226 (Miss. 2002).

¶27.    Section 73-3-55 of the Mississippi Code provides that "[i]t shall be unlawful for any person to engage in the *practice of law in this state* who has not been licensed according to law."[27]   Section 73-3-55 focuses on the "practice of law in this state" by nonlicensed individuals such as court clerks or attorneys not licensed in Mississippi.[28]   By its plain language, it seeks only to regulate the practice of law "in this state."[29]   And, as the trial judge astutely observed,

> The case sub judice shows that the contracts were signed out of state.  The proof has shown that the initial contract with Lisa Forbes was obtained in the state of Alabama . . . . The proof has shown that a Mississippi law firm was associated.  From this point forward, Weathers filed the suit in Mississippi with no pleadings or entry of appearance by St. Martin.  It can only be determined what was done in Mississippi was done by a Mississippi lawyer. In the absence of evidence to the contrary, as stated in St. Martin's deposition, that St. Martin was a go between for Forbes and Weathers, as well as, lacking any activity or footprints of St. Martin showing up in Mississippi . . . . St. Martin also indicated that Forbes conferred with him several times in his Louisiana office.  The record is void of any evidence of St. Martin and Forbes ever interfaced [sic] on the case in Mississippi and cannot be assumed to hold otherwise.

¶28.    In analyzing Forbes's unauthorized-practice-of-law allegation, the Court of Appeals

---

[27]Miss. Code Ann. § 73-3-55 (Rev. 2012).

[28]*See Darby v. Mississippi State Bd. of Bar Admissions*, 185 So. 2d 684 (Miss. 1966) (holding that a chancery clerk violated the statute when she drafted deeds, deeds of trust, notes, bills of sale, and title certificates to real property without a law license).

[29]*See Fought & Co., Inc. v. Steel Engineering Erection, Inc.*, 951 P.2d 487 (Haw. 1998).

focused on Rule 46 of the Mississippi Rules of Appellate Procedure. Rule 46 governs the admission of out-of-state attorneys to practice *pro hac vice*, that is, to allow an out-of-state attorney special permission to participate in a specific case even though the attorney is not licensed in Mississippi. Rule 46(b)(2) provides that "a foreign attorney *shall not appear* in any cause except as allowed pro hac vice under this Rule 46(b)." St. Martin was not admitted *pro hac vice*, which would have subjected him to Mississippi's standards of professional conduct.[30] So we must consider whether he "made an appearance" in this state in violation of our rules. And if so, what are the consequence of doing so?

¶29. We first addressed what constitutes "making an appearance" for the purpose of requiring *pro hac vice* admission in *In re Williamson*, 838 So. 2d 226 (Miss. 2002). We explained that "an 'appearance by attorney' is defined as 'holding oneself out to be representing a client.'" *Id.* at 235 (citation omitted). We took judicial notice that it was common practice for attorneys at that time to include the names of foreign attorneys on pleadings filed in Mississippi, even when the foreign attorney had no intention of being admitted *pro hac vice*. *Id.* We explained, "*in the future*, attorneys are hereby noticed and cautioned that a foreign attorney will be deemed to have made an appearance in a Mississippi lawsuit if the foreign attorney . . . allows his or her name to be listed on the pleadings." *Williamson*, 838 So. 2d at 235 (emphasis added). We further explained that an appearance may be made by "physically appearing at . . . a deposition . . . or any other proceeding in

---

[30]*See* M.R.A.P. 46(b)(3).

19

which the attorney announces that he or she represents a party to the lawsuit . . . ." ***Id.*** We held that such actions require a foreign attorney to be admitted *pro hac vice* under Rule 46.[31] However, ***Williamson*** was decided in 2002, and, by its explicit language, does not apply retroactively to the instant action, as the complaint in this personal-injury action was filed in 1998.

¶30.    As St. Martin's alleged unauthorized appearance in Mississippi occurred before ***Williamson*** was decided and before Rule 46 was amended to define "appearance," the relevant inquiry is whether St. Martin held himself out to be representing a client in Mississippi litigation.  The Court of Appeals reasoned that there was enough evidence to present a question of fact as to whether St. Martin practiced law in Mississippi, in part because he provided the Forbeses with legal advice on Mississippi law.  However, St. Martin provided the legal advice at his office, located in Louisiana.  We find no authority that supports a finding that advising a client on Mississippi law at an office located in another state constitutes an appearance in Mississippi or that an attorney would be required to seek admission *pro hac vice* in Mississippi before taking such action.

¶31.    As to whether St. Martin made an unauthorized appearance in Mississippi by having his name listed on the initial complaint, albeit without his permission, and appearing at depositions, we find that, prior to ***Williamson***, it was common practice for foreign attorneys to allow their names to be listed on pleadings even if they had not sought to be admitted *pro*

---

[31]Rule 46 was amended in 2003, after ***Williamson***.

*hac vice* and did not intend to do so. Because St. Martin's name was listed on the complaint without being admitted *pro hac vice* before such conduct was prohibited by this Court and Rule 46, we find that this act did not rise to the level of making an unauthorized appearance in Mississippi, especially considering that St. Martin did not authorize the listing of his name and that he promptly had it removed. As to St. Martin's appearance at the depositions, we find that participating and holding oneself out to be representing a client in a deposition in Mississippi would have constituted an appearance in Mississippi even pre-***Williamson***. We agree that there is a question of fact as to whether St. Martin held himself out to be representing the Forbeses at depositions in Mississippi and, therefore, made an unauthorized appearance in Mississippi.

¶32. However, a question of fact as to whether St. Martin made an unauthorized appearance does not preclude the grant of summary judgment in his favor because that conduct would not "give rise to a cause of action," nor does it "create any presumption that a duty has been breached." Instead, the consequences of an unauthorized appearance in a Mississippi case would be for a court to deny St. Martin the right to appear, possibly cite him for contempt, and refer the matter to the disciplinary counsel of the Mississippi Bar for appropriate action under Mississippi Code Section 73-51-1.[32] Nothing in Rule 46 or Section 73-51-1 gives rise to a civil cause of action, and we find no support for the conclusion that such a violation would operate to void a contract entered into between the offending attorney

---

[32]M.R.A.P. 46(b)(11).

and his client, which already has been fully performed.

¶33.    Additionally, we find no support for the Court of Appeals' determination that the contract may not be enforceable because St. Martin entered into the contract knowing that he could not represent the Forbeses without making an appearance in Mississippi, which his lack of a Mississippi law license precluded him from doing.  Attorneys routinely enter into contracts for representation with clients in matters that they know may be litigated in foreign jurisdictions in which they may not be licensed to practice.  This is the purpose of our rules requiring attorneys to associate local counsel and to be admitted *pro hac vice*, and nothing in our rules or law indicate a contract for legal representation is illegal or void merely because an attorney entered into it with the knowledge that he likely will have to associate local counsel and/or be admitted *pro hac vice* to fulfill the representation.  There is no evidence that St. Martin could not have been successfully admitted *pro hac vice* in this matter if he had chosen to be.  Furthermore, it is not unusual for some matters to be resolved through settlement before litigation commences, in which case an attorney would be able to fulfill his representation without ever making an appearance in court.  Therefore, we find that, absent some evidence of fraud or misrepresentation, a contract for legal representation is not void merely because the attorney knows or should know that he may be required to enter an appearance in a foreign jurisdiction.

¶34.    For the foregoing reasons, we find no questions of fact as to whether St. Martin breached his duty of loyalty.  Moreover, because we find no questions of fact as to whether

22

St. Martin violated either his duty of care or his duty of loyalty, Forbes's negligence claim fails. Forbes's claims for fraud and conversion also fail, as both are merely restatements of his breach-of-fiduciary-duty arguments. For these reasons, the judgment of the Court of Appeals is reversed and the judgment of the chancery court is reinstated and affirmed.

¶35. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS REINSTATED AND AFFIRMED.**

**WALLER, C.J., KITCHENS AND KING, JJ., CONCUR. KITCHENS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY LAMAR AND KING, JJ.; WALLER, C.J., JOINS IN PART. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER AND COLEMAN, JJ. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND CHANDLER, J. RANDOLPH, P.J., AND PIERCE, J., NOT PARTICIPATING.**

**KITCHENS, JUSTICE, SPECIALLY CONCURRING:**

¶36. While concurring with the well-reasoned majority opinion authored by Justice Lamar, I write separately to underscore certain of the excellent points made by her, and to make additional observations which I deem pertinent.

¶37. The late Louis St. Martin's admittedly satisfied clients, James R. Forbes and his spouse, Lisa Forbes, seek to have their cake and eat it too by disgorging from St. Martin's estate the attorney fee which the attorney had earned and to which the Forbeses had contractually agreed. In the first instance, the Forbeses attempt to repudiate the contract of employment signed by Lisa Forbes in Mobile, Alabama, on August 11, 1998, shortly after the accident in which James Forbes had been injured. Interestingly, but erroneously, Lisa's

entering into this contract is characterized as having been undertaken on behalf of James; and, in a very real sense, it was undoubtedly to James's advantage for competent attorneys to begin investigating and preparing his case immediately, rather than commencing that process after James himself could sign a contract, which would not occur until months later. In truth, however, James is not mentioned in the Mobile contract. Rather, it is a contract between St. Martin's law firm and *Lisa* Forbes only. The accident in which James had been injured is described in that agreement as "explosion at Texaco Gas Station in Biloxi." As James Forbes's spouse, Lisa was well within her rights to employ the attorney(s) of her choice to represent her in the pursuit of her own claim for loss of consortium, pursuant to Mississippi Code Section 93-3-1. With James in a coma and thus completely incapacitated, Lisa's legitimate entry into a contract of employment with an attorney who had been recommended and sent to her by members of her own family served the important purpose of promptly getting a lawyer on the job of gathering and preserving vital evidence that likely would have dissipated rapidly.

¶38.    Some ten months later, after James's condition had greatly improved and under far less exigent circumstances, both he and Lisa  signed a second contract of employment with St. Martin's firm. This occurred at St. Martin's law office in Terrebonne Parish, Louisiana, on June 10, 1999. As can be gleaned from a reading of  the majority opinion, both contracts with the St. Martin firm appear to have been entered into by informed and willing parties, and all of the attendant circumstances were above board and without any hint of impropriety

24

on the part of anyone. Indeed, nothing about St. Martin's conduct strikes me as unusual or inappropriate.

¶39. St. Martin was formally hired in Alabama and in Louisiana to represent two Mississippi residents who believed they were entitled to compensation for a serious injury that had befallen one of them–James–in Mississippi. Although I greatly respect the opinion of my valued colleague, Justice Coleman, that the engagement of St. Martin by the Forbses was illegal, I could not disagree more. At the time the Forbses retained St. Martin's services, nothing in the jurisprudence of Mississippi prohibited its citizens from employing out-of-state attorneys from other U.S. jurisdictions to handle legal matters for them within this state, provided those attorneys jumped through the hoops of associating Mississippi-licensed counsel–which St. Martin promptly did–and, when appropriate, acquired *pro hac vice* status. In 1998, when the Forbeses first hired St. Martin, Mississippi Rule of Appellate Procedure 46 did not contain a definition of what an "appearance" was in the context of the requirement of *pro hac vice* admission.[33] Clearly, St. Martin had good reason to understand that his role in handling the Forbses' claims could legally be fulfilled by associating Mississippi counsel and acting in an advisory capacity without participating in Mississippi court proceedings or depositions.[34] Indeed, as observed by the majority, at the time he participated in the litigation,

---

[33]I must also note the confusion that surely results from this Court's placement of the rules to obtain *pro hac vice* admission to *trial* courts in its Rules of *Appellate* Procedure.

[34]In Louisiana, at the time the Forbeses retained St. Martin's services, an out-of-state attorney who wished to be involved in a case in Louisiana was required only to associate

he could not have known that he could be at risk in making an "appearance" by the placement of his name on a pleading[35] or by simply showing up at a deposition, as this Court had not yet decided what "appearance" means in the *pro hac vice* context. *See* ***In re Williamson***, 838 So. 2d 226, 235 (¶ 22) (Miss. 2002). Accordingly, I do not see how the contracts between the Forbeses and St. Martin could have been illegal, as there was no law prohibiting the promises made by St. Martin when they were created. That said, I do not disagree with the majority's conclusions respecting certain invalid provisions in both contracts.

¶40.     Additionally, with abiding respect for Justice Coleman and his interpretation of the contracts to the effect that St. Martin contractually obligated himself to be the only lawyer on Earth who would work on the Forbeses' case, a reading of the two contracts in their entirety refutes this notion. The language in the opening paragraph of both documents makes it abundantly clear that the word *attorney* does not refer to one lawyer: ". . . [client] hereby employ[s] and retain[s] St. Martin, Mahoney & Associates (A Professional Law

---

"with some attorney duly licensed to practice law by the supreme court of [Louisiana]." La. Rev. Stat. Ann. § 37:214. The Supreme Court of Louisiana later changed that rule to require stricter *pro hac vice* admission standards. *See* La. Sup. Ct. R. XVII § 13.

[35]Prior to this Court's finding fault with this practice, as explained by the majority, including associated out-of-state attorneys on pleadings was often done, and was thought by many reputable attorneys to be a good and courteous practice in terms of disclosure to opposing counsel and to courts of all attorneys who would be involved in the litigation, even if that involvement would be nominal and/or would not entail court appearances by all listed counsel.

Corporation), (hereinafter referred to as 'attorney') to handle any and all claims. . . ." Without doubt, this language informs the reader that not just one lawyer, but *a firm of lawyers* is being hired by the clients.

¶41. The clause in the contracts which seems to stand between Justice Coleman and the realities of the agreement between these parties is, "My (Our) attorney is to have *the exclusive handling of this claim. . . .*" (Emphasis added.) The meaning of this contractual provision turns on one's understanding of the word *handling* in the context of the work performed by plaintiffs' attorneys and, as I have come to understand it, means attending to and overseeing the prosecution of the claim. It does not preclude the involvement of attorneys in addition to Louis St. Martin in the prosecution of the Forbeses' claims. Indeed, the contracts were between the claimants and the law firm of which Louis St. Martin was a member, not just with St. Martin as an individual lawyer. No one could read the first paragraph of the contracts and glean any expectation that Louis St. Martin would be the only lawyer working on behalf of the Forbeses. The purpose of the provision that "My (Our) attorney is to have the exclusive handling of this claim. . ." is to prevent the clients from hiring a different lawyer or set of lawyers *in addition to* the St. Martin firm and the Mississippi-licensed lawyers to be associated by that firm. This clause in nowise precludes St. Martin and his firm from enlisting whatever attorneys outside his law firm they might deem necessary to the proper handling of the case.

¶42. Finally, in light of the state of extreme vulnerability of contingency-fee attorneys who

are reminded by today's decision that they are prohibited from including so-called "anti-settlement" and "anti-termination" clauses in their employment contracts, Mississippi practitioners are cautioned that it behooves them to keep accurate time records, even in cases in which they hope to earn a contingency fee. Such records may become of vital importance in an attorney's attempt to be paid on a *quantum meruit* basis if a client settles without his attorney's knowledge or if a client terminates his lawyer's employment before the claim has been concluded by settlement or judgment. And, of course, it always is essential that the attorney keep detailed records of out-of-pocket expenses in furtherance of the client's claim. Obviously, this is necessary for the attorney to obtain reimbursement from the client at the end of a contingency-fee case (and cases with different fee arrangements as well), and can take on great importance to a discharged attorney who wishes to impress a lien upon a former client's claim and/or monies in the hands of alleged tort feasors and/or their insurance carriers.

¶43.    A word to the wise is sufficient.

**LAMAR AND KING, JJ., JOIN THIS OPINION. WALLER, C.J., JOINS THIS OPINION IN PART.**

**DICKINSON, PRESIDING JUSTICE, DISSENTING:**

¶44.    While I do not deny the accuracy of Justice Coleman's well-reasoned dissent, I am not prepared to say that St. Martin necessarily should be or – had the majority correctly decided this case – would be denied compensation for any services he may have rendered to the Forbes family.  St. Martin should be denied recovery under the illegal contract.  But

28

nothing prevents him from pursuing compensation through a claim of unjust enrichment and quantum meruit.[36] So for the same reasons stated by Justice Coleman, I respectfully dissent.

**CHANDLER AND COLEMAN, JJ., JOIN THIS OPINION.**

**COLEMAN, JUSTICE, DISSENTING:**

¶45. Attorney Louis St. Martin was never licensed to practice law in Mississippi, and he never sought or received permission to appear *pro hac vice* in the litigation at issue. Nevertheless, he entered into a contract in 1998 with Lisa Forbes wherein he promised "to handle any and all claims that [the Forbeses] may have against Texaco." Pursuant to the language of the contract, St. Martin was "to have exclusive handling of [the] claim." The contract provided that St. Martin would practice law on behalf of the Forbeses in the State of Mississippi.

¶46. As he was not licensed in Mississippi and never achieved admission to practice *pro hac vice*, St. Louis's promise was an illegal one. Miss. Code Ann. § 73-3-55 (Rev. 2012); *see also Darby v. Miss. State Bd. of Bar Admissions*, 185 So. 2d 684 (Miss. 1966).

> The objective of both the legislature and the courts in supervising admissions to the bar is the protection of the public against injuries from acts or services, professional in nature, constituting the practice of law, and done or performed by those not deemed to be qualified to perform them. . . . The welfare of the public is the principal consideration.

*Darby*, 185 So. 2d at 687. The courts "have the duty and the power to declare void and unenforceable contracts made in violation of law or in contravention of the public policy of

---

[36] *See Ground Control, LLC v. Capsco Industries, Inc.*, 120 So. 3d 365 (Miss. 2013).

29

the state." ***Smith v. Simon***, 224 So. 2d 565, 566 (Miss. 1969). Because the contract was for services St. Martin could not legally provide and in contravention of established public policy, I would hold it to be void as a matter of law.

¶47. In his separate opinion, Justice Kitchens takes the position that, because St. Martin associated local counsel, nothing was wrong with the contract. With respect, I disagree, although I might agree if the contract allowed St. Martin to associate local counsel. St. Martin contracted to perform a service he could not legally perform precisely because the contract provided he would exclusively handle the claim. What he actually did or what the parties *may* have intended as to the hiring of local counsel is not relevant to the terms of the contract, which are unambiguous in the instant regard. ***Brothers v. Winstead***, 129 So. 3d 906, 913 (¶ 13) (Miss. 2014) ("Our concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy."). *See also* ***Ivison v. Ivison***, 762 So. 2d 329, 335 (¶ 17) (Miss. 2000) ("When this Court interprets a contract, we look to the contract for its meaning, not what a party thereto may have thought it meant. The standard is objective, measured by the language of the contract, not by the subjective intent or belief of a party which conflicts with meaning ascertained by the objective standard.") (citation omitted). St. Martin contracted to do that which he could not legally do – practice law in the State of Mississippi. Justice Kitchens's position, that St. Martin could legally handle the claim *pro hac vice*, errs in that, had St. Martin requested

admission *pro hac vice*, he wold have been required by Rule of Appellate Procedure 46(b)(4) to retain local counsel, which in turn would have violated the terms of the contract.

¶48.    Justice Kitchens correctly points out that the contract defines the "attorney" who would represent the Forbeses as St. Martin's firm, St. Martin, Mahoney & Associates, and not St. Martin himself.  With respect, I nonetheless disagree with his conclusion that, as we do not know if any other members of St. Martin's firm were licensed in Mississippi, we cannot say the contract was illegal.  First, while certainly not conclusive, there is no evidence in the record that any other attorney in St. Martin, Mahoney & Associates was licensed in Mississippi.  It was a small firm and the firm's letterhead, which appears in the record, does not indicate any of the attorneys were licensed in Mississippi.  Second, a person cannot have a lawyer-client relationship with a law firm; only with a lawyer may such a relationship exist. *See* Miss. Rules of Prof'l Conduct 1.2.  At most, the fact that the contract defines the firm, rather than St. Martin, as the attorney creates an ambiguity regarding who the parties intended would represent the Forbeses, and any such ambiguity is easily cleared up upon an examination of the record, which contains, *inter alia*, the following: (1) a letter dated August 13, 1998, from St. Martin to local counsel detailing his findings made pursuant to investigating the facts underlying his clients' claims, confirming that St. Martin would advance the Forbeses' living expenses to them, and confirming all other expenses would be divided fifty-fifty; (2) a letter from local counsel to St. Martin, dated August 16, 1998, wherein local counsel requested that St. Martin review a proposed complaint, discussing

31

litigation strategy, and requesting suggestions from St. Martin; (3) another letter from local counsel, dated August 17, 1998, to St. Martin acknowledging that St. Martin had authorized the filing of the complaint; and (4) a June 10, 1999, letter from St. Martin to local counsel to the effect that St. Martin had counseled the clients regarding a settlement offer, including the legal ramifications of the offer, and that the clients had rejected the offer. The June 10, 1999, letter bears the signatures of St. Martin and both clients. St. Martin testified via his own deposition that he attended depositions taken in the case. Given the foregoing facts of record, no other reasonable conclusion can be reached than the parties to the contract intended for St. Martin to represent the Forbeses.

¶49. Not only did the contract contain an illegal promise – the promise to practice law without a license – our laws against practicing law in Mississippi without a license undoubtedly were broken in the performance of the contract. In *In re Williamson*, we held that the following actions by an out-of-state attorney constituted the practice of law in Mississippi: the cases in question originated from the attorney's office and were "his" cases, the cases came to his office via a toll-free phone number he advertised in Mississippi, he reviewed the cases to determine their merit, he provided expert witnesses, and he worked with local counsel to file a complaint. *In re Williamson*, 838 So. 2d 226, 235-236 (¶¶ 23-24) (Miss. 2002). The Court further wrote,

> [The attorney in question] clearly conferred with clients, advised them as to their legal rights and then engaged the services of another attorney to litigate the claim. He procured each and every client through commercials on the television. Once their claims were investigated by Miller and his office staff,

32

he contacted Williamson. Miller characterized these cases as "his" cases. He continued to advise Williamson on the case and, in the case sub judice, attended a deposition. Miller also had a financial interest in the outcome of these cases.

*Id.* at 236 (¶ 27). The *Williamson* Court explicitly held that such factors supported a finding of the unlicensed practice of law irrespective of whether the unlicensed attorney's names appeared on the pleadings. *Id.* at 235 (¶ 23).

¶50. If the facts underlying the *Williamson* Court's conclusion constituted a sufficient basis for holding that an unlicensed attorney engaged in the practice of law in Mississippi, then certainly the facts in the case *sub judice* provide an even greater basis for such a finding. The conclusion that St. Martin did, in fact, practice Mississippi law without a license to do so delivers me to my final point of disagreement with the majority. The majority opinion appears to indicate that a foreign attorney, such as St. Martin, who avails himself of Mississippi's courts and law to gather and handle cases, is not subject to Mississippi's Rules of Professional Conduct. Certainly, in the instant case, he would have been. St. Martin undisputedly was an attorney licensed in Louisiana. Rule 5.5(a) of Louisiana's Rules of Professional Conduct provides, "A lawyer shall not practice law in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so." So important has Rule 5.5 been deemed to be, that the Louisiana Supreme Court has disbarred attorneys for its violation. *Dinet v. Gavagnie*, 948 So. 2d 1281, 1284 (¶ 9) (Miss. 2007) (citing *In re Stamps*, 874 So. 2d 113, 125 (La. 2004)).

¶51. Although I would reach a different result than the majority strictly on the basis that

33

the contract itself contains an illegal promise, I also disagree and believe that St. Martin engaged in the unlicensed practice of law and subjected himself to Mississippi's Rules of Professional Conduct.

¶52.    Accordingly, I respectfully dissent.

**DICKINSON, P.J., AND CHANDLER, J., JOIN THIS OPINION.**