# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00823-COA

**DURANT HEALTHCARE, LLC A/K/A HOLMES COUNTY LONG TERM CARE CENTER AND C. BRUCE KELLY**                                    APPELLANTS

**v.**

**DEAUNDRAY GARRETTE, INDIVIDUALLY, AND AS ADMINISTRATOR OF THE ESTATE OF ZION GARRETTE, AND ON BEHALF OF AND FOR THE USE AND BENEFIT OF THE WRONGFUL DEATH BENEFICIARIES OF ZION GARRETTE**                                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/25/2021 |
| TRIAL JUDGE: | HON. BARRY W. FORD |
| COURT FROM WHICH APPEALED: | HOLMES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | JOSEPH SPENCER YOUNG JR. |
| ATTORNEYS FOR APPELLEE: | RICHARD PAUL WILLIAMS III |
| | COURTNEY McREYNOLDS WILLIAMS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 11/29/2022 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**McDONALD, J., FOR THE COURT:**

¶1. Durant Healthcare LLC a/k/a Holmes County Long Term Care Center and C. Bruce Kelly (collectively "Durant Healthcare") appeal from the Holmes County Circuit Court's order denying Durant Healthcare's motion to compel arbitration and its motion for arbitration-related discovery in this wrongful death case. Durant Healthcare argues that the deceased, Zion Garrette, was mentally competent at the time of his admission to the nursing home and bound himself to an arbitration provision in an agreement that he signed. Durant Healthcare further argues that Zion is also bound because his daughter, Debbie Carter, signed

as his agent, and Zion was the third-party beneficiary of the admission agreement. In the alternative, Durant Healthcare contends that the circuit court erred in denying arbitration-related discovery. Considering the evidence in the record and the arguments of counsel, we affirm the circuit court's decision.

## Facts and Court Proceedings

¶2.     Zion was a welder most of his life but became permanently disabled and unable to work when he was in his fifties. He suffered from rhabdomyolysis, the breakdown of damaged muscle tissue (which can cause pain), weakness, vomiting, and confusion. He had also been diagnosed with bipolar disorder and had several psychiatric hospitalizations over the years. However, his family never instituted any guardianship or conservatorship proceedings.

¶3.     In May of 2017, when he was sixty-eight, Zion was treated at the University of Mississippi Medical Center at Grenada. At various times during his stay, Zion exhibited mental confusion. The first medical record provided was a May 15, 2017 presentation to the emergency room for Zion's increased weakness. According to Dr. Frank Brown, Zion was "unable to give a history of present illness because he is confused but able to verbalize some." However, in Dr. Brown's physical exam of Zion, he noted Zion as being alert and "oriented to person, place and time" with normal behavior and thought content.

¶4.     Zion was transferred from UMMC Grenada to UMMC Holmes County on May 20, 2017. On May 28, 2017, Dr. Brown found Zion to be "confused slightly," but neurologically

2

alert with a GCS score of 15.[1]  Between then and May 30, 2017, Zion's medical records noted that he had impaired mental status with decreased orientation.  An undated discharge summary (made sometime after May 19, 2017) indicated his condition as "unable to complete ADL's; mental status impaired with decreased orientation."

¶5.     However, on June 7, 2017, in his assessment of  Zion's neurological condition, Dr. Elias Abboud found him to be alert and oriented to person, place, and time.  Throughout May and June 2017, Zion was treated for several conditions, including encephalopathy (a disease or damage to the brain that affects one's mental state), and dysphagia (a swallowing disorder).  He also was diagnosed with fluid build-up on the brain (hydrocephalus), bipolar disorder, and depression and treated with psychotropic medications.

¶6.     On June 15, 2017, Zion, accompanied by his daughter, Carter, presented to Durant Healthcare for admission to the facility.  At that time, they both signed an admission agreement that contained a provision entitled "Arbitration."  Under this provision, Durant Healthcare and Zion and his family would agree to mutually choose an arbitrator who would settle any legal disputes or claims between them.  According to the provision, the arbitration would be conducted using the American Arbitration Association's commercial rules, but the Association's arbitrators would not be used.  The arbitration provision was not a document separately signed by Zion and Carter; rather it was only a provision included in the overall

---

[1] "GCS" refers to the Glasgow Coma Scale, which assesses a patient's level of consciousness based on the patient's reaction to different stimuli.

admission agreement. Zion signed the admission agreement in a nearly illegible hand, which required someone to write the words "his signature" by it. In addition to signing the admission agreement as Zion's responsible party, Carter also signed a separate acknowledgment that said that Zion was competent to sign the admission agreement.

¶7.    Nurse Practitioner Amy Johnson completed her admitting physician's orders and Progress Note on June 15, 2017. In it, she confirmed Zion's medical diagnosis on admission including, among other things, hydrocephalus, and a bipolar condition. The note contained Zion's medical history, a review of systems, vital signs, a physical exam, her diagnosis, and an assessment. Under her review of Zion's neurological system, Johnson wrote "no loss of consciousness, transient ischemic symptoms, or seizures." But unlike prior neurological exams by other doctors, Johnson did not indicate whether Zion was oriented to person, place, and time. Under her physical exam, Johnson relates "cranial nerves: Cns II-XII are grossly intact." There is nothing else in her assessment relating to Zion's cognitive abilities.

¶8.    However, on an "MDS Nurses Summary" of Zion's condition covering June 15, 2017, to June 21, 2017, Nurse Palmertree indicated that Zion was disoriented as to place and time; that he had a short-term memory problem; that he could not name the current season, the location of his room, any staff names or faces, or that he was even in a nursing home. The nurse concluded in her "BIMS" assessment (Brief Interview for Mental Status) that Zion was a "6" on a scale of 1-15, putting him in the severe cognitive impact category.[2] On the same

_____

[2] In Deaundray's reply to Durant Healthcare's motion to compel arbitration, Deaundray explained how a BIMS assessment is conducted: that a patient is asked to repeat

day of his admission, June 15, 2017, the nursing home's social services director and director of nursing noted that there were no plans for Zion's discharge; that he needed nursing home care because of "wandering behavior warranting 24○ supervision," and that Zion's stay was indefinite.

¶9.     Although a nutrition record signed by the nursing home's dietary manager and dated June 21, 2017, noted Zion's mental status as alert, on June 26, 2017, Dr. Todd Fulcher noted that "the pt's congnition [sic] and processing are limiting him."[3]  At that time, Dr. Fulcher noted Zion was only oriented to person and purpose.  The occupational therapist assessment noted that when Zion began therapy, "he was largely nonresponsive verbally."

¶10.     Durant Healthcare's Resident Care Plan for Zion indicated that on June 26, 2017, Zion required assistance for, among other things, cognitive deficits.  On a similar undated document, it was indicated that staff was setting goals for Zion's "severe" cognitive deficits noted.

¶11.     On July 15, 2017, a month after admission, Zion began speech therapy.  At that time, the therapist assessed his ability to understand "yes/no" questions and follow one-step commands at less than 25%.  The speech therapist set as a goal that the "patient will demonstrate adequate comprehension to improve ability to respond to yes/no and open/ended

_____

three words, which he is told he needs to remember later in the interview; that the patient is asked the year, month, and day of the week; and that the patient is asked to recall the three words and given cues if necessary.

   [3] In addition, Zion's diagnosis noted in the nutrition record included hydrocephalus, unspecified altered mental status, and cognitive communication deficits.

questions, follow directions, and participate in meaningful conversations." On that same date, Dr. Fulcher noted that a barrier to Zion's functioning was his "altered mental status."

¶12. Dr. Fulcher did not complete a Pre-Admission Screening (PAS) Application for Zion's qualification for Medicaid until July 19, 2019, a month after his admission. At that time, Dr. Fulcher found Zion to be totally dependent and needing assistance for all ten of his daily activities.[4] He found Zion to be incontinent two or more times a week, and that Zion gave incorrect answers to person, place, and time questions four out of eleven times. Dr. Fulcher said Zion did not have dementia but that he had a diagnosis of a major mental illness and a history of taking psychotropic medications. He determined that Zion's judgment impairment level was "mild to moderate." He confirmed the primary medical diagnosis of encephalopathy and dysphagia.

¶13. On that same assessment form, Social Worker Lana Richardson screened Zion, and circled "yes" to a category that "[p]erson has a history of, or presents any evidence of cognitive or behavior functions that indicate the need for an MR evaluation." Interestingly, this Medicaid form was not signed by Zion, but by Carter in a section reading "I hereby acknowledge my participation in this screening process, agree that I have had long term care program options explained to me and have indicated my choice by initialing the appropriate box above." Moreover, Carter signed this form on June 15, 2017, which given the dates of

---

[4] These included ambulation, bathing, eating, medication management, toileting, transferring, personal hygiene, community mobility, dressing, and meal preparation.

the professional staff entries, had to have been blank at that time.

¶14. Nurse Palmertree again evaluated Zion on July 21, 2017, and noted that he still had an "altered level of consciousness." On her "MDS Nurses Summary" from July 27 and July 28, 2017, she noted that Zion was only alert and oriented to himself, that he had both short- and long-term memory problems, and that he still could not recall the current season, location of his room, staff names, or whether he was in a nursing home. He now had an even lower BIMS score of 2. He sometimes could understand others, but rarely or never was able to express his own ideas or wants.

¶15. Based on Durant Healthcare's Pre-Screening Assessments, on July 26, 2017, the Mississippi Department of Mental Health approved Zion for nursing-home level of care and specialized treatment for mental illness.

¶16. During the course of his stay at Durant Healthcare, Zion suffered from severe bedsores and on July 19, 2019, Zion died. The list of causes on his death certificate included cardiopulmonary arrest, decubitus ulcers with infection, dementia, and malnutrition.

¶17. On January 21, 2021, Zion's son, Deaundray, filed a complaint in the Holmes County Circuit Court against Durant Healthcare on behalf of Zion's estate and wrongful death beneficiaries. Among other things, Deaundray alleged that the negligent care provided by Durant Healthcare proximately caused or contributed to Zion's death.

¶18. On February 25, 2021, Durant Healthcare filed a motion to compel arbitration. It claimed that Zion had the mental capacity at the time of his admission to sign the admissions

agreement in which he agreed on behalf of himself and his heirs to submit any claims or disputes with Durant Healthcare to arbitration, foreclosing any judicial actions concerning the circumstances of his death. Durant Healthcare also pleaded that Zion's daughter, Carter, signed an acknowledgment that confirmed her father's mental capacity to sign the arbitration agreement. Durant Healthcare further asserted that Carter represented herself to be Zion's authorized agent. The nursing home also pleaded that Zion was a third-party beneficiary of the contract and, thus, his estate and heirs were estopped from denying the enforceability of the arbitration agreement under the doctrine of beneficiary estoppel. Durant Healthcare requested that the action be dismissed or stayed pending arbitration. Durant Healthcare attached Deaundray's complaint and the arbitration agreement as exhibits to its motion.

¶19. On March 16, 2021, Deaundray responded to the motion. He contended that Zion, who was seventy years old at the time of his death, was mentally incapacitated at the time of his admission to the nursing home. Thus, Deaundray argued, Zion could not legally execute any contract. Moreover, Carter had no power of attorney, conservatorship, or guardianship order that gave her any authority to sign on Zion's behalf. In addition, Deaundray argued, Mississippi law has rejected the creation of an informal agency relationship when it comes to having authority to execute arbitration agreements. He attached numerous portions of Zion's medical records at or near the time of his admission to Durant Healthcare to support his opposition to Durant Healthcare's motion to compel arbitration.

¶20. On May 24, 2021, Durant Healthcare filed its reply to Deaundray's response to its

8

motion to compel arbitration. It too attached portions of Zion's medical records. Notably, neither party attached any affidavits from either Carter or personnel from Durant Healthcare who were involved in the admission process, concerning the events that transpired at the time of the execution of the admission agreement.

¶21. After receiving Deaundray's response, Durant Healthcare filed a motion for arbitration discovery. It said that, although there was adequate information in the record to determine that Zion was competent at the time of his admission to the nursing home, Durant Healthcare sought further discovery on (1) Zion's mental capacity at the time of admission and (2) on the circumstances surrounding the execution of the documents and Zion's expressed appointment of Carter as his authorized agent. It did not identify any specific documents or depositions that it would seek through such discovery.

¶22. On June 22, 2021, the circuit court heard arguments on Durant Healthcare's motion to compel arbitration. Deaundray's counsel argued that the BIMS evaluation prepared by Nurse Palmertree on June 15, 2017, the date of Zion's admission, showed that Zion did not have the capacity to execute the agreement; that he was disoriented to both place and time; that he had short-term memory problems; and that he was severely impaired when it came to Zion's cognitive skills for daily decision making. At that point, the circuit court stopped Deaundray's counsel and engaged in the following exchange with Durant Healthcare's counsel:

> THE COURT: Let me stop you there a minute. You've just heard what -- what he -- do you agree with what -- his assessment or

9

|  |  | do you disagree? |
|---|---|---|
| MR. YOUNG: | | Your Honor, I would disagree to the extent that the medical records speak for themselves. And that - - |
| THE COURT: | | I don't want to know about the medical records speaking for themselves. About his [Zion's] knowledge of person, place, and time. |
| MR. YOUNG: | | Well, Your Honor, I think that the medicals do -- they-- they're conflicting. That when you look at May the 20, 2017 - - |
| THE COURT: | | When they interviewed him, did that - - did that interview check what he had just told me? |
| MR. YOUNG: | | Yes, Your Honor. But when you look at the medical records after [the] fact and before, it says that he is oriented to person, place, and time on May the 20 of 2017, which is less than a month prior to. There's - - |
| THE COURT: | | Yeah. But this wasn't the date that he was admitted. |

At the end of arguments by counsel, the circuit court ruled that on the date of admission Zion was not competent to sign the admission/arbitration agreement and that Zion had not conferred any authority on his daughter to sign for him. Accordingly, the court denied the motion to compel. Durant Healthcare's counsel asked about its motion for arbitration-related discovery and the circuit court denied that as well. Both parties submitted proposed orders concerning the court's ruling. Durant Healthcare objected to the factually detailed order that Deaundray proposed. The court adopted the order proposed by Durant Healthcare, which was entered on June 25, 2021. Durant Healthcare appealed that order on July 20, 2021.

¶23.    On appeal, Durant Healthcare presents five arguments: first, that the arbitration

10

agreement was enforceable because Zion had the mental capacity to sign the agreement; second, that the agreement was binding because it was signed by Carter, Zion's authorized representative; third, that both Zion and his heirs are equitably estopped from denying the terms of the admission agreement by virtue of the third-party beneficiary doctrine; fourth, that the arbitration agreement was procedurally and substantially conscionable; and fifth, that, in the alternative, arbitration-related discovery was improperly denied.

## Standard of Review

¶24. "The grant or denial of a motion to compel arbitration is reviewed de novo." *McIntosh Transp. LLC v. Love's Travel Stops & Country Stores Inc.*, 339 So. 3d 141, 145 (¶7) (Miss. Ct. App. 2022) (quoting *Rogers-Dabbs Chevrolet-Hummer Inc. v. Blakeney*, 950 So. 2d 170, 173 (¶11) (Miss. 2007)). Factual findings by the trial court are reviewed for abuse of discretion. *Id.* (citing *Virgil v. Sw. Miss. Elec. Power Ass'n*, 296 So. 3d 53, 59 (¶11) (Miss. 2020)).

## Discussion

¶25. Arbitration agreements may be enforced in the nursing home/long-term care setting. *See Dalon v. MS HUD Ocean Springs LLC*, 283 So. 3d 90, 94 (¶10) (Miss. 2019) (finding general power of attorney granted to son authorized son to sign arbitration agreement on father's behalf). To determine whether there is a valid arbitration agreement, we apply the legal principles of contract law. *Trinity Mission Health & Rehab of Holly Springs LLC v. Lawrence*, 19 So. 3d 647, 649 (¶5) (Miss. 2009) ("To conclude that there was an agreement

11

to arbitrate, there must be a valid contract.").

¶26.    The elements of a contract are "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Est. of Humphrey ex rel. Humphrey v. Tunica Cnty. Health & Rehab LLC*, 329 So. 3d 563, 567 (¶14) (Miss. Ct. App. 2021); *Tarvin v. CLC of Jackson LLC*, 193 So. 3d 633, 637 (¶11) (Miss. 2016); *Adams Cmty. Care Ctr. LLC v. Reed*, 37 So. 3d 1155, 1158 (¶7) (Miss. 2010).

¶27.    "The burden of establishing the existence of an arbitration agreement, in line with the burden of establishing the existence of a contract, rests on the party seeking to invoke it." *Diversicare of Meridian LLC v. Shelton*, 334 So. 3d 487, 493 (¶18) (Miss. Ct. App. 2022) (quoting *Wellness Inc. v. Pearl River Cnty. Hosp.*, 178 So. 3d 1287, 1292 (¶14) (Miss. 2015)). If the record establishes that the parties did enter into a valid contract, then the party resisting arbitration has the burden of proving any other defense. *McIntosh Transp. LLC*, 339 So. 3d at 145 (¶7) (citing *Norwest Fin. Miss. Inc. v. McDonald*, 905 So. 2d 1187, 1193 (¶11) (Miss. 2005)). As the proponent of the arbitration agreement in this case, Durant Healthcare contends that either Zion was competent to sign or that Carter had the authority to sign the arbitration agreement on Zion's behalf.

**I.      Whether Zion had the legal capacity to sign the arbitration agreement.**

¶28.    The Mississippi Supreme Court has held that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Wellness Inc.*, 178 So. 3d

12

at 1292 (¶14) (quoting *Trinity Mission Health & Rehab. of Holly Springs*, 19 So. 3d at 651 (¶14)). The law presumes that a person is sane and mentally capable of entering into a contract. *Frierson v. Delta Outdoor Inc.*, 794 So. 2d 220, 224 (¶8) (Miss. 2001) (citing *Foster v. Wright*, 240 Miss. 566, 572, 127 So. 2d 873, 876 (1961)). "The burden is upon the party seeking to avoid an instrument on the ground of insanity or mental incapacity to establish it by a preponderance of proof." *Manhattan Nursing & Rehab. Ctr. LLC v. Hollinshed*, 341 So. 3d 991, 993 (¶6) (Miss. Ct. App. 2022). To be considered competent, an individual must be able to "know or understand his legal rights sufficiently well to manage his personal affairs." *Est. of St. Martin v. Hixson*, 145 So. 3d 1124, 1131 (¶16) (Miss. 2014) (quoting *Rockwell v. Preferred Risk Mut. Ins. Co.*, 710 So. 2d 388, 391 (¶9) (Miss. 1998)).

¶29. To establish incapacity to contract, the proof must show more than "a general mental weakness or condition" of mind. *Richardson v. Langley*, 426 So. 2d 780, 784 (Miss. 1983). The test asks, "Is his mind so unsound, or is he so weak in mind, or so imbecile, no matter from what cause, that he cannot manage the ordinary affairs of life?" *Shippers Exp. v. Chapman*, 364 So. 2d 1097, 1100 (Miss. 1978). The Mississippi Supreme Court has held that a "trial court may also determine whether a party is competent for purposes of executing a will or signing an option, where there was no previous legal adjudication of unsoundness of mind." *Rockwell*, 710 So. 2d at 390-91 (¶10) (citing *In re Est. of Briscoe*, 293 So. 2d 6, 7-8 (Miss.1974); *Alford v. Crocker*, 221 So. 2d 363, 363 (Miss. 1969)).

¶30. The "ordinary affairs of life" relate to a person's "ability to make important personal,

business and life decisions." *Liberty Health & Rehab of Indianola LLC v. Howarth*, 11 F. Supp. 3d 684, 687 (N.D. Miss. 2014). In that nursing-home case, where the decedent's mental capacity to sign an arbitration agreement was challenged, the federal district court explained:

> Having reviewed Mississippi case law discussing this term, however, it seems reasonably clear that the "affairs" in question relate to the ability to make important personal, business and life decisions. In other words, the standard does not inquire as to whether the individual is able to brush his teeth, but rather looks to his capacity to make coherent decisions regarding important matters.

*Id.* In that case, the district court found that the decedent, Peacock, lacked capacity based on a nurse's assessment at the time of admission as follows:

> [T]he court finds most enlightening Nurse Smith's finding that he was unable, on the date he signed the arbitration agreement, to state what year it was, within five years. The court views this fact to be one which is very difficult to "spin," and plaintiff has made little effort to do so. In the court's view, an inability to state what year it was, within five years, reflects a profound diminishment of mental capacity and a significant disconnect from reality. In her examination of the decedent, Nurse Smith also found that he was unable to recall simple words such as "sock," "blue" and "bed" mere minutes after they had been spoken to him, and she found that this inability persisted even after she gave him verbal hints. Clearly, this finding is further indicative of a very significant mental impairment on the part of Mr. Peacock.

*Id.*

¶31. In *Hollinshed*, we found that the decedent Adams did not have the mental capacity to sign an arbitration agreement based on, among other things, notations in the nursing home's records as well. We noted that the facility's admission notes and care plan for Adams showed that he was diagnosed with "depression with altered mood & behavior," such as

14

"yelling out disruptively, [being] anxious and easily annoyed; [and a] decline in psychosocial well being." *Hollinshed*, 341 So. 3d at 994 (¶9). The notes described his demeanor and behavior as "agitated frequently; confused at times;" and that he was taking thirteen medications, including Norco and Valium. *Id.*

¶32. We previously dealt with the issue of mental capacity in *Magee Cmty. Care Ctr. LLC v. Perkins*, 333 So. 3d 34 (Miss. Ct. App. 2021). In that case, Williams, a fifty-five-year-old resident of a nursing center who had a history of mental and physical health issues was required to sign an admission agreement that contained an arbitration provision upon his transfer to the Magee facility known as Hillcrest. *Id.* at 37 (¶¶2-3). His brother also signed the agreement as a responsible party along with an acknowledgment of competency that stated that he believed his brother was mentally competent. *Id*. at (¶3). Williams had resided at two other nursing homes prior to his admission to Hillcrest. *Id*. at (¶4). At the last one, approximately twenty-five days before his transfer, Williams scored a 5 out of 15 on his BIMS (Brief Interview for Mental Status) evaluation and was diagnosed with severe cognitive impairment. *Id*. at 38 (¶5). Within five days of his admission to Hillcrest, Williams had multiple instances of combative and irregular behavior. *Id*. at (¶6). On day six post-admission, Hillcrest records indicated he had memory problems and that "he had a severely impaired cognitive status for making decisions regarding tasks of daily life." *Id*. at (¶7).

¶33. When Williams died and his mother filed suit, Magee Care Center filed a motion to

15

compel arbitration. *Id*. at 37 (¶1). The trial court denied the motion and on appeal, we affirmed the trial court's denial. *Id*. at 43 (¶30). We specifically reviewed the record and found there was a wealth of documentary evidence showing that Williams was mentally incompetent. *Id*. at 41 (¶22). However, we specifically noted the important question was "what proof was present as to Williams's mental capacity on the date the contract was entered." *Id*. at 42 (¶24). The mother's counsel was asked at oral argument what proof there was of lack of capacity "on the legally important date." *Id*. Counsel pointed to Williams's diagnosis of dementia and psychotic disorder with delusions, that Williams suffered from short-term memory loss, was confused as to time, and signed his agreement "Hawrence Williams" instead of "Lawrence Williams." *Id*. Based on the record in that case, we found no abuse of discretion by the trial court in determining that Williams did not have the mental or legal capacity to sign. *Id*.

¶34. In the case at hand, Durant Healthcare points to medical records before and after Zion's admissions to argue that he was competent on June 15, 2017. We agree that the records show that Zion's mental status fluctuated between May and July 2017. However, the circuit court noted, as we did in *Perkins*, that what is important is Zion's condition on the date that the agreement was signed. On that date, we have two medical assessments by Durant Healthcare personnel. One was from Nurse Practitioner Johnson, which covered her physical examination of Zion. Although she found him *physically* neurologically intact, she made no assessment of his *cognitive abilities*. But she continued orders for eight medications

16

for Zion, including psychotropic drugs. The other assessment by Nurse Palmertree did include an evaluation of Zion's cognitive abilities, including the results of her BIMS of Zion. She found Zion had short-term memory problems, was disoriented to place and time, and could not recall the current season or whether he was even in a nursing home. She concluded that his "cognitive skills for daily decision making" were "severely impaired." She noted Zion's score on the BIMS, which we referred to in *Perkins*, was a 6 out of 15, indicating severe impairment. Significantly, during the argument on the motion before the circuit court, Durant Healthcare admitted that Nurse Palmertree's assessment did reflect Zion's condition on the day of admission.

¶35. The dissent points to two other sections in Nurse Palmertree's admission assessment where she checked the box indicating that Zion was "alert and oriented" and that he could understand "verbal content" with "clear comprehension." However, a closer examination of the "alert and oriented x 3" section shows that Nurse Palmertree had crossed out the "x 3" and also checked that Zion is disoriented in two of the three categories, place and time. Moreover, the section where there are check-marked boxes that Zion could understand verbal content with clear comprehension is entitled "Hearing, Speech and Vision," which merely determined that Zion could hear, talk, and see. As previously noted, Nurse Palmertree definitively determined that Zion's cognition was severely *impaired*, not just impacted, with a BIMS score of 6.[5]

---

[5] The dissent also notes the reason for Zion's admission—"generalized muscle weakness with physical deconditioning"—as a fact relating to Zion's mental capacity at the

17

¶36.    The dissent also notes that Zion's mental evaluation in January 2018 found him "oriented x3" and able to maintain focus and that he had a higher BIMS score (11 out of 15) in April 2018. But the dissent also agrees that the most weight should be given to evidence of Zion's mental capacity at the time he signed the admission agreement. *Post* at ¶50. So his mental capacity seven to ten months later, after he had received mental health services, is irrelevant to his condition on June 15, 2017. The dissent points to other entries in Zions's medical records made during the month before his admission where he was alert and oriented to person, place, and time.[6] We recognize that the Mississippi Supreme Court has noted in cases dealing with the conveyance of property that mental capacity can change over time, saying "[t]his Court has recognized that mental incapacity or insanity is not always permanent, and a person may have lucid moments or intervals when that person possesses necessary capacity to convey property." *Smith v. Smith*, 574 So. 2d 644, 652 (Miss. 1990). That is why Zion's condition on June 15, 2017, the day he signed the agreement, is the most critical evidence for determining whether he had the ability to enter into a binding contract, as the dissent acknowledges.

---

time of admission. The dissent misses the point; the issue is not whether Zion was admitted for physical or mental limitations, but rather whether on the date of his admission he had the mental capacity to enter into a contract.

[6] The dissent notes that prior to his admission to the nursing home, a hospital record showed that he was alert with a GCS (Glasgow Coma Scale) score of 15, the highest possible. However, the GCS scale merely measures a person's level of consciousness after a brain injury, based on the person's ability to perform eye movements, speak, and move his or her body. G. Teasdale & B. Jennett, *Assessment of Coma and Impaired Consciousness. A Practical Scale*, 304 The Lancet 7872, at 81-84 (July 13, 1974).

18

¶37. Durant Healthcare argues that Zion's daughter, Carter, signed a form on that day saying that she believed Zion was competent. However, there is no proof that Carter was a medical professional or qualified in any way to form such an opinion. Moreover, the pre-printed form Carter signed contained no specifics of Zion's condition that would contradict the medical assessment made by Nurse Palmertree. We also note that Zion was taking eight medications, including psychotropic drugs, and his signature on the agreement was nearly illegible. Given the record before us, we agree with the circuit court that Zion lacked the mental capacity to sign the agreement on admission and, therefore, the circuit court did not abuse its discretion.

¶38. Durant Healthcare claimed the need for additional discovery concerning Zion's capacity, and the dissent agrees. But nothing prevented Durant Healthcare from submitting affidavits from Nurse Practitioner Johnson, Nurse Palmertree, or Lana Richardson, the social worker who witnessed the execution of the admission agreement, as to their recollection of Zion's condition, actions, and demeanor at that time, to counter the facility's own records. Because a party seeking to compel arbitration may waive that right should it participate in the litigation process, *Miss. Credit Ctr. Inc. v. Horton*, 926 So. 2d 167, 180 (¶42) (Miss. 2006), affidavits are routinely used to support or oppose a motion to compel. *See E. Ford v. Taylor*, 826 So. 2d 709, 712 (¶¶6-8) (Miss. 2002) (involving a dispute over whether a truck sold to Taylor was new or used and considering affidavits of Taylor, Taylor's expert, and the salesman to determine if an arbitration agreement was enforceable); *Dalon v. Ruleville*

19

*Nursing & Rehab. Ctr LLC.*, 161 F. Supp. 3d 406, 416 (N.D. Miss. 2016) (considering a son's affidavit concerning his mother's mental capacity).

¶39. There must be a compelling showing that discovery is needed. *Am. Gen. Life Ins. Co. v. Harper*, No. 3:15cv605-DPJ-FKB, 2016 WL 430609, at *2 (S.D. Miss. Fed. 3, 2016). In Harper's challenge to the arbitration agreement in an insurance policy, the federal district court reasoned:

> Even assuming Harper could now attack the arbitration agreement itself, he fails to provide a more specific theory as to why the arbitration agreement might be void or what he hopes to discover about it. Presumably, Harper possesses personal knowledge regarding what he was told, or should at least be able to explain a theory. *See Bell v. Koch Foods of Miss., LLC*, 358 Fed. Appx. 498, 501 (5th Cir. 2009) (affirming denial of arbitration-related discovery where movant had personal knowledge of facts and otherwise failed to show why discovery was needed).

*Id*. Similarly, here Durant Healthcare had its own personnel who had personal knowledge of the events on the day of admission and who could provide testimony through their affidavits. Durant Healthcare did not need to depose Carter to establish those facts.[7] Here there is a nurse's assessment of Zion's mental incapacity on the day he signed the agreement, similar to what the court relied upon in *Liberty Health & Rehab of Indianola LLC*, 11 F.

---

[7] In its motion for arbitration-related discovery, Durant Healthcare only identified one person it wanted to depose, Carter. Otherwise it only generically stated that it wanted discovery "on the issues of (1) Zion Garrette's mental competency at the time of admission to the nursing facility and (2) the circumstances surrounding the execution of the Admission Agreement." The dissent goes further to identify other needed depositions, i.e., of treating physicians, which Durant Healthcare did not name when presenting its motion to the trial court.

Supp. 3d at 687. The dissent contends that discovery is needed because there is no physician testimony that Zion was incapacitated on that day. However, there is no record that his treating physician even saw him that day to render such an opinion. Thus, Durant made no compelling showing of the need for discovery.

¶40. In summary, whether Zion was competent before June 15, 2017, or after is not relevant when the record contains Durant Healthcare's own assessment of Zion's incapacity, which it admitted was made on the critical day in question. Those assessments show that Zion was not competent to sign the admission agreement and there was no need for formal discovery when Durant Healthcare could have presented any evidence to dispute its own records by affidavit and it did not.

**II.      Whether Carter had the authority to sign the admission agreement as Zion's legal representative.**

¶41. Durant Healthcare admits that Carter did not possess a power of attorney, conservatorship, or other formal legal device to act on Zion's behalf. However, Durant Healthcare argues that when Carter signed the admission agreement on a line indicating that she signed as Zion's responsible agent, she had the authority to do so. We disagree.

¶42. "The burden of proving an agency relationship rests squarely upon the party asserting it." *Diversicare*, 334 So. 3d at 495 (¶24) (quoting *Forest Hill Nursing Ctr. Inc. v. McFarlan*, 995 So. 2d 775, 781 (¶13) (Miss. Ct. App. 2008)). Although there is no formality required for the creation of an agency relationship, "an express agency is generally based on an *oral or written* agreement between the principal and the agent." *Id.* "Actual authority, also

21

termed express or direct authority, is the authority actually conferred by the principal." *Newsome v. Peoples Bancshares*, 269 So. 3d 19, 28 (¶24) (Miss. 2018). "An express agent is one who is 'in fact authorized by the principal to act on their behalf.'" *Forest Hill Nursing Ctr. Inc.*, 995 So. 2d at 781 (¶13) (citing *McFarland v. Entergy Miss. Inc.*, 919 So. 2d 894, 902 (¶25) (Miss. 2005)). Another form of agency authority is implied authority, which is the "authority that the principal has by words or conduct held the alleged agent out as having." *Miss. Bar v. Thompson*, 5 So. 3d 330, 336 (¶26) (Miss. 2008).

¶43. A third type of authority, apparent authority, "exists when a reasonably prudent person, having knowledge of the nature and the usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have." *Cent. Indus. Inc. v. McFarlane*, 159 So. 3d 610, 614 (¶7) (Miss. Ct. App. 2015). However, in establishing apparent authority, one must first prove the acts or conduct on the part of the principal that indicate the extent of the agent's authority. *Id*. Thus, to establish any type of agency authority, a claimant must present sufficient evidence of words, acts, or conduct of the principal to conclude that the agent had the authority to perform a specific act. *Adams Cmty. Care Ctr. LLC*, 37 So. 3d at 1160 (¶14). At the heart of the proof allegedly creating agency, then, are the actions and words of the principal.

¶44. In this case, other than arguing caselaw that a formal legal device is not needed to grant actual authority to an agent, Durant Healthcare argues no facts in the record showing

22

that Zion acted in any way that established Carter's agency. Instead, Durant Healthcare merely points to Carter's signature on the admission form that has pre-printed on it the words "responsible agent." Durant Healthcare presents no evidence that Carter made any other independent assertion that she was Zion's agent, nor is there any form or any document signed by Zion that appointed Carter as his agent. In addition, Durant Healthcare presented no affidavit from anyone present at the execution of these documents who relates any other actions or conversations among the parties from which one could infer the creation of an agency relationship.

¶45. Although Durant Healthcare argued that arbitration-related discovery should have been allowed so that deposition testimony could be developed to support its position, nothing precluded Durant Healthcare from presenting affidavits from its own personnel concerning the events that transpired at the signing to support its position. Surely, if Zion had said or done something at the time of admission that established Carter as his agent, those to whom Durant Healthcare had direct access could have presented such sworn testimony by affidavit. There was no need for formal discovery on this issue either.

¶46. Because we hold that the circuit court did not err in finding that Zion lacked capacity to sign the admission/arbitration agreement and that Durant Healthcare failed to present sufficient proof to establish Carter as his agent to do so, we affirm the circuit court's denial of Durant Healthcare's motion to compel arbitration. Moreover, we find no abuse of discretion by the circuit court in denying Durant Healthcare's motion for arbitration-related

23

discovery when Durant Healthcare's own medical records established Zion's incapacity to either sign himself or appoint an agent. Because there was no valid, enforceable contract, there is no need for us to consider Durant Healthcare's other issues concerning the agreement's conscionability, or equitable estoppel based on the third-party beneficiary of a contract doctrine.[8]

**Conclusion**

¶47. Because the evidence in the record supports the circuit court's conclusion that the deceased lacked the mental capacity to sign Durant Healthcare's admission agreement containing an arbitration provision and that the decedent's daughter did not have authority to sign the agreement as his agent, we affirm the circuit court's order denying Durant Healthcare's motion to compel arbitration. Moreover, because the proof submitted to the circuit court was sufficiently clear on the issue, we further affirm the circuit court's order denying Durant Healthcare's motion for arbitration-related discovery. These rulings moot any other issues raised by Durant Healthcare on appeal.

¶48. **AFFIRMED.**

**BARNES, C.J., GREENLEE, WESTBROOKS, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. LAWRENCE, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WILSON, P.J., AND LAWRENCE, J.**

**CARLTON, P.J., DISSENTING:**

---

[8] "For a third-party beneficiary to exist, a valid contract must first exist." *GGNSC Batesville LLC v. Johnson*, 109 So. 3d 562, 565 (¶7) (Miss. 2013).

24

¶49.     I respectfully dissent from the majority's decision to affirm the circuit court's order denying Durant's motion to compel arbitration and motion for arbitration-related discovery on the issues of (1) Zion's mental competency when he signed the nursing facility admission agreement containing the arbitration provision; and (2) the circumstances surrounding the execution of the admission agreement, including Zion's express appointment of his daughter, Carter, as his authorized agent and responsible party.  Upon review of the record and the applicable law, I find that the circuit court abused its discretion in denying Durant's request for arbitration-related discovery prior to ruling on Durant's motion to compel arbitration.  I therefore would reverse the circuit court's order and remand this case with instructions that the parties be allowed arbitration-related discovery on these issues.

¶50.     As the majority acknowledges, under Mississippi law there is a presumption of mental competency, Deaundray has the burden of showing a lack of mental capacity on Zion's part, and Zion's lack of mental capacity must be shown by a preponderance of the evidence.  The majority also points out that under Mississippi law, evidence of mental competency at the time the instrument was executed is entitled to the most weight.  *See, e.g.*, *Dalon v. Ruleville Nursing & Rehab. Ctr. LLC*, 161 F. Supp. 3d 406, 415 (N.D. Miss. 2016).  In this case, however, the circuit court denied Durant's request for limited arbitration-related discovery on this issue—despite the conflicting medical records and the complete lack of any clear mental-capacity determination by a treating physician.  As such, I find that the circuit court abused its discretion when it denied Durant the opportunity to ensure that all such relevant

25

evidence was presented to the court before it ruled on Durant's motion to compel arbitration.

¶51.    For example, the majority emphasizes an MDS Nurses Summary covering Zion's date of admission (June 15, 2017) through June 21, 2017.  This summary indicates that Zion was disoriented as to the place and time; that he had a short-term memory problem; that he could not name the current season, the location of his room, or any staff names or faces; and that he did not know whether he was in a nursing home.  The summary also indicates a "BIMS" assessment (Brief Interview for Mental Status) of 6 on a scale of 1-15, putting him in the severe-cognitive-impact category.

¶52.    The same MDS Nurses Summary, however, also indicates that Zion was "[a]lert and oriented" as to person and that he could understand "verbal content" with "clear comprehension."  With respect to Zion's BIMS score of 6 out of 15, I find that this score is neither definitive nor consistent because Zion subsequently scored an 11 out of 15 on the BIMS test in April 2018.

¶53.    Further, numerous medical records indicate that Zion was competent both shortly before and after his admission, which conflicts with excerpts from the same medical records referenced by the majority indicating some cognitive impairment.  For example, just one month prior to being admitted to the nursing facility, Zion was admitted to UMMC Grenada.  Medical records from the neurological and psychiatric exam at the hospital document that Zion "is alert and oriented to person, place, and time. . . .  He has a normal mood and affect.  His behavior is normal. Thought content normal."  Similarly, when Zion was transferred to

26

UMMC Holmes County a week later, these hospital records indicate that he was "alert and oriented to person, place and time." Likewise, the neurological exam at the hospital documents that Zion "is alert, GCS [Glasgow Coma Scale] score is 15," which is the highest possible score. To be sure, Zion has a history of psychiatric treatment for depression and bipolar disorder, but this history of mental health problems does not show a diagnosis of Alzheimer's disease or any other finding of mental incompetency. I find no support for any assumption that a psychiatric condition like bipolar disorder would render a patient unable to make a contract, particularly when, as here, there is no physician's finding of lack of mental incapacity.

¶54. I also observe that on the date of his admission, Zion was evaluated by Nurse Practitioner Amy Johnson. I find it relevant that the evaluation shows that Zion was admitted to the nursing facility for *physical* reasons, "following hospitalization in a swing bed unit for generalized muscle weakness with physical deconditioning." Nowhere in that evaluation is there any indication that Zion was admitted for mental incapacity issues, nor is there any diagnosis of Alzheimer's disease or any other condition or finding of mental incompetency.

¶55. Following admission, numerous medical records indicate that Zion was "alert," that he "c[ould] fully communicate," and that he had the "ability to understand others." A mental evaluation in January 2018 found that Zion could "maintain[] focus," had "appropriate and organized [thought process]," and was "oriented to self, time and place."

¶56. These varying neurological-function determinations and the lack of any mental

27

capacity determination by a physician made it all the more important that Durant be allowed its requested arbitration-related discovery. I therefore find that the circuit court abused its discretion in denying this request prior to ruling on Durant's motion to compel arbitration. I recognize that, in general, courts in Mississippi will deny arbitration-related discovery "absent a compelling showing that such discovery is required." *E.g.*, *Am. Gen. Life Ins. Co. v. Harper*, No. 3:15cv605-DPJ-FKB, 2016 WL 430609, at *2 (S.D. Miss. Feb. 3, 2016). I find that the above-described circumstances constitute "compelling" reasons to have allowed arbitration-related discovery in this case with respect to Zion's mental capacity to make a contract (i.e., depositions of Zion's primary treating physician(s) regarding his mental capacity) and whether an actual agency relationship had been created between Zion and his daughter.

¶57. The majority suggests that Durant could have obtained affidavits from nursing-facility personnel regarding Zion's mental capacity at the time the admission agreement was executed. This assertion ignores Durant's inability to depose Zion's primary treating physician(s) or to question Carter regarding her representation in her acknowledgment that she executed on the day of Zion's admission (that to the best of her personal knowledge her father had never been declared mentally incompetent and was of sound mind to execute the admission agreement). And, as noted, Carter also executed the admission agreement on her father's behalf as his actual authorized agent and responsible party. Thus, I find that arbitration-related discovery was also warranted to allow Durant to address Carter's

28

understanding with respect to this agency relationship.

¶58.    I find that an opportunity for this narrow, limited discovery is particularly important in the arbitration context because Durant, as the party seeking to compel arbitration, was strictly prohibited from engaging in any form of discovery absent explicit permission from the circuit court or else risk waiver of the right to arbitrate. *See, e.g.*, *Pass Termite & Pest Control Inc. v. Walker*, 904 So. 2d 1030, 1034 (¶12) (Miss. 2004) ("In Mississippi, a party waives the right to arbitrate when it actively participates in a lawsuit or takes other action inconsistent with the right to arbitration. Taking advantage of pre-trial litigation such as answers, counterclaims, motions, requests, and discovery obviates the right to arbitration." (citation and internal quotation marks omitted)).

¶59.    For all these reasons, I find that the circuit court abused its discretion in denying the requested limited arbitration-related discovery prior to ruling on Durant's motion to compel arbitration.  Accordingly, I respectfully dissent.

**WILSON, P.J., AND LAWRENCE, J., JOIN THIS OPINION.**